Docket No. 01–7091.

United States Court of Appeals,
Second Circuit.

Argued Sept. 27, 2001.

Decided Dec. 20, 2001.

**Roberta TODD, individually and on behalf of herself and all others similarly situated, Plaintiff–Appellant,**

v.

**EXXON CORPORATION, Mobil Corporation, B.P. America Inc., Occidental Petroleum Corporation, Shell Oil Company, Sun Company, Inc. (R & M), Philips Petroleum Co., Texaco Inc., Chevron Corp., Conoco Inc., Marathon Oil Company, Amoco Corporation, Atlantic Richfield Company, and Union Oil Company, Defendants–Appellees.**

John F. Carney, Carney & McKay, Pelham, N.Y. (Joseph P. Garland, Klein &

Solomon, LLP, New York, NY, J. Dennis Faucher, Ellen Meriwether, Miller Faucher and Cafferty LLP, Philadelphia, PA, on the brief), for plaintiff-appellant.

James C. Egan, Jr., Clifford, Chance, Rogers & Wells LLP, New York, N.Y. (Sean M. Murphy, C. Neil Gray, Clifford, Chance, Rogers & Wells LLP, Jon A. Baughman, Nichole D. Galli, Thomas E. Zemaitis, Pepper Hamilton LLP, Philadelphia, PA, Mark R. Merley, Arnold & Porter, Washington, DC, Thomas G. Hungar, Jeffrey A. Wadsworth, Gibson, Dunn & Crutcher LLP, Alan M. Grimaldi, Howrey Simon Arnold & White LLP, Lawrence R. Jerz, Robert D. Wilson, Texaco, Inc., White Plains, NY, Terry Calvani, Pillsbury Winthrop LLP, Washington, DC, Gregory A. Markel, Brobeck, Phleger & Harrison LLP, New York, NY, Ronald W. Teeple, Defrees & Fiske, Chicago, IL, Harvey Shapiro, Sargoy, Stein, Rosen & Shapiro, Saul P. Morgenstern, Dewey Ballantine LLP, New York, NY, Jeffrey R. Witham, Dewey Ballantine LLP, Los Angeles, CA, Yosef J. Riemer, Jonathan F. Putnam, Kirkland & Ellis, New York, NY, Richard C. Godfrey, J. Andrew Langan, Kirkland & Ellis, Chicago, IL, James H. Carter, James V. Masella, III, Sullivan & Cromwell, New York, NY, on the brief), for defendants-appellees.

Before: WALKER, Chief Judge, OAKES and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Plaintiff-appellant Roberta Todd appeals from an order of the United States District Court for the Southern District of New York (Sprizzo, J.) granting defendants-appellees' motion to dismiss the complaint for failure to state a claim pursuant to Fed. R.Civ.P. 12(b)(6). We hold that plaintiff adequately alleges a § 1 Sherman Act violation for an unlawful information exchange. Plaintiff's complaint alleges a plausible product market, a market structure that is susceptible to collusive activity, a data exchange with anticompetitive potential, and antitrust injury. We therefore vacate and remand.

## BACKGROUND

Plaintiff brought this action against fourteen major companies in the integrated oil and petrochemical industry, collectively accounting for 80–90% of the industry's revenues and employing approximately the same percentage of the industry's workforce.[1] *Todd v. Exxon Corp.*, 126 F.Supp.2d 321, 323 (S.D.N.Y. 2000); Second Am. Compl. ¶¶ 15–28, 101 [hereinafter "Compl."]. On behalf of herself and all other similarly situated current and former Exxon employees (the putative class),[2] plaintiff alleges that defendants violated § 1 of the Sherman Act by regularly sharing detailed information regarding compensation paid to nonunion managerial, professional, and technical ("MPT") employees and using this information in setting the salaries of these employees at artificially low levels. *Todd*, 126 F.Supp.2d at 322–23. Plaintiff seeks money damages and equitable relief pursuant to § 1 of the Sherman Act. Compl. ¶¶ 129, 132–133.

Accepting the allegations in the complaint as true, as we must on this motion

---

1. We note that at least two of the defendant companies, Exxon Corporation and Mobil Corporation, have since merged.

2. Issues regarding class certification under Fed.R.Civ.P. 23 are not addressed in the district court's opinion or in the litigants' briefs. The only issue before the Court is whether plaintiff states a claim under Fed.R.Civ.P. 12(b)(6).

to dismiss, the facts of this case are as follows. Defendants instituted a system whereby they periodically conducted surveys comparing past and current MPT salary information and participated in regular meetings at which current and future salary budgets were discussed. *Todd,* 126 F.Supp.2d at 323; Compl. ¶ 88. The data exchanges were also accompanied by assurances that the information would be used in setting the salaries of MPT employees. Compl. ¶ 106. Defendants' "Job Match Survey" created a common denominator to facilitate the comparison of MPT salaries. *Id.* ¶ 50. The survey used certain jobs at defendant Chevron as benchmarks. The other defendants would submit detailed information regarding the jobs at their companies that were most comparable to the Chevron benchmark jobs so that they could be matched. *Id.* ¶ 51. The survey compared the responsibilities and compensation packages offered by defendants for certain jobs and job types against those of the benchmark positions at Chevron. *Todd,* 126 F.Supp.2d at 323 n. 4. This survey was coordinated by defendants Unocal and Chevron. Chevron and Unocal each would meet with half of the other companies involved to develop matches to the benchmarks, and then would gather the information before submitting it to a third-party consultant, Towers Perrin. Towers Perrin compiled the information, then analyzed, refined, and distributed it to the defendants on diskettes and in the form of hard copies. Compl. ¶ 52. Since not all jobs could be matched precisely, defendants agreed upon certain percentage "offsets" to facilitate the comparison. *Id.* ¶ 53. The Job Match Survey was performed every two years and was supplemented in the "off years" by the "Grade Average Update," which would calculate the change in grade average salaries since the last Job Match Survey and then adjust the salary level from the previous year's survey by the amount of the change. *Id.* ¶¶ 67–68.

Defendants' "Job Family Survey" provided the most current account of the compensation being paid in the industry. Each company submitted information on salaries actually paid in thirty different categories of jobs, or "job families," classified according to the nature of the work. *Id.* ¶ 69. The information exchanged for each family was broken down by the job level classification, experience level, and academic background of the MPT employee. *Id.* ¶ 69. This survey was coordinated by Exxon, and again the information was submitted to and compiled by Towers Perrin. Each participating company received the information from Towers Perrin in hard copy and disk form. The information gathered in the survey was updated and distributed to the participants several times per year. *Todd,* 126 F.Supp.2d at 323 n. 5.

Furthermore, each company was entitled to receive subsets of Job Family Survey data, consisting of salary information from as few as three companies at a time. Compl. ¶ 70. Plaintiff alleges that Exxon used these subsets to compare its own salaries with those of six particular competitors, referred to as the "Six Majors." *Id.* ¶ 75. These periodically updated data sets were used by each defendant to determine whether the announced budgets of its competitors had been implemented so that each could consider what adjustments should be made to coordinate salary levels. *Id.* ¶ 76.

Although these were the primary forms of salary information exchange, defendants supplemented this information with data from other sources. Defendants' "Advancement Guides" established requirements for advancement within a given salary grade of employee. *Id.* ¶ 77. These guides were used by defendants to slow

the rates of advancement for MPT employees in defendants' companies. *Id.* ¶ 79. The "ABC," "B–1" and "B–2" surveys collected additional data regarding bonuses and other non-standard payments above base compensation that were not captured in the Job Match and Job Family Surveys. *Id.* ¶¶ 80, 82. The "Long Term Incentive Survey" refined the comparison further by accounting for the economic value of certain non-cash benefits paid to MPT employees. *Id.* ¶ 83. The "Starting Salary Survey," in which only the Six Majors apparently participated, measured starting salaries of college graduates entering MPT positions. *Id.* ¶¶ 84–85. In addition to the data exchange surveys, human resource personnel at defendant companies held regular meetings—at least three times per year—to discuss and exchange salary and salary-related information. *Id.* ¶¶ 87, 91–95. These meetings included discussions of individual defendants' current and future salary budgets for MPT employees. *Id.* ¶¶ 88, 92.

Plaintiff contends that defendants' arrangement violated § 1 of the Sherman Act. *Id.* ¶¶ 127, 131. According to the complaint, these violations had the purpose and effect of depressing MPT salaries paid by defendants. *Id.* ¶¶ 117, 120. The arrangement reduced the incentive for defendants to bid up salaries in order to attract experienced MPT employees or to retain employees who might be lured to other firms. *Id.* ¶¶ 103–104. As a result, the plaintiffs in the putative class received compensation that was materially lower than what they would have received but for defendants' anticompetitive practices. *Id.* ¶¶ 128, 132.

Plaintiff alleges that Exxon, in particular, used this data to maintain a market position slightly above the so-called "Six Majors" and below three higher-paying competitors referred to as the "High Three." *Id.* ¶ 58. Exxon capitalized on the shared data to decrease its "competitive factor"—the percentage by which Exxon would have to adjust its salary levels in order to maintain alignment with the salaries offered by its competitors. *Id.* ¶ 108. Exxon's competitive factor dropped from 6.5% in 1991 to 0% in 1995, *id.* ¶ 109, and its salaries decreased 4.1% between 1987 and 1994 in comparison to the Six Majors, *id.* ¶ 75. The various information exchanges also allowed Exxon to reduce its overall salary index versus the competition from 110.7% in 1987 to 107.0% in 1993. *Id.* ¶¶ 89, 113.

The district court granted defendants' motion to dismiss the complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). *Todd,* 126 F.Supp.2d at 328. The court held that (1) plaintiff failed to plead a plausible product market, undermining the claim that defendants control 80–90% of the relevant market; (2) even if the alleged market were plausible, plaintiff failed to allege that the market structure is susceptible to collusive activity; (3) plaintiff failed to allege facts supporting an agreement to fix salary levels; and (4) plaintiff failed to show detrimental effects on competition. Plaintiff appeals the dismissal.

## DISCUSSION

### I. *Standard of Review*

 We review *de novo* the district court's grant of defendants' motion to dismiss pursuant to Rule 12(b)(6). *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001). On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true. *Connolly v. McCall,* 254 F.3d 36, 40 (2d Cir.2001). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff

can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Thus, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

■ No heightened pleading requirements apply in antitrust cases. "[A] short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." *George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 (2d Cir.1977). Furthermore, "[i]n antitrust cases in particular, the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.' " *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)). It is nonetheless improper "to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors of California, Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

## II. *The Rule of Reason*

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Traditional "hard-core" price fixing remains *per se* unlawful under the seminal case *United*

*States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 212–24, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), and its progeny. If the plaintiff in this case could allege that defendants actually formed an agreement to fix MPT salaries, this *per se* rule would likely apply. Furthermore, even in the absence of direct "smoking gun" evidence, a horizontal price-fixing agreement may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices. *See, e.g., Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226–27, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *Ambook Enters. v. Time Inc.,* 612 F.2d 604, 614–18 (2d Cir.1979). Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement.

■ There is a closely related but analytically distinct type of claim, also based on § 1 of the Sherman Act, where the violation lies in the information exchange itself—as opposed to merely using the information exchange as evidence upon which to infer a price-fixing agreement. This exchange of information is not illegal *per se,* but can be found unlawful under a rule of reason analysis. *See Battipaglia v. N.Y. State Liquor Auth.,* 745 F.2d 166, 174–75 (2d Cir.1984) (Friendly, J.). The state of the law on this issue was not always so clear. *Compare Am. Column & Lumber Co. v. United States,* 257 U.S. 377, 411–12, 42 S.Ct. 114, 66 L.Ed. 284 (1921), *and United States v. Am. Linseed Oil Co.,* 262 U.S. 371, 389–90, 43 S.Ct. 607, 67 L.Ed. 1035 (1923), *with Maple Flooring Mfrs. Ass'n v. United States,* 268 U.S. 563, 582–83, 45 S.Ct. 578, 69 L.Ed. 1093 (1925), *Sugar Inst., Inc. v. United States,* 297 U.S. 553, 598, 56 S.Ct. 629, 80 L.Ed. 859 (1936), *and Cement Mfrs. Protective Ass'n v. United States,* 268 U.S. 588, 602–03, 606,

45 S.Ct. 586, 69 L.Ed. 1104 (1925). In *United States v. Container Corp. of America*, the Supreme Court held that information exchange itself could constitute a § 1 violation, upholding the sufficiency of a complaint charging "an exchange of price information but no agreement to adhere to a price schedule." 393 U.S. 333, 334, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). The Court found that under the market conditions present in that case, and in light of the nature of the information disseminated, the data exchange caused a stabilization of prices and thus had an anticompetitive effect on the market for corrugated containers. *See id.* at 337, 89 S.Ct. 510. Unclear in the wake of *Container Corp.* was whether such exchanges were *per se* unlawful or subject to a rule of reason. The Court used some of the language of the Court's *per se* jurisprudence, yet conducted a market analysis that suggested a rule of reason. *See id.* at 336–38, 89 S.Ct. 510. In a well-known concurrence, Justice Fortas urged that a *per se* rule was not appropriate. *See id.* at 338–40, 89 S.Ct. 510 (Fortas, J., concurring).

The Supreme Court resolved the confusion in *United States v. Citizens & Southern National Bank,* clarifying that "the dissemination of price information is not itself a *per se* violation of the Sherman Act." 422 U.S. 86, 113, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975). In *United States v. United States Gypsum Co.,* the Court explained its reasoning: "The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). The Court then set out the basic framework for the rule of reason inquiry in this context: "A number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication." *Id.*

As plaintiff does not allege an actual agreement among defendants to fix salaries, we analyze plaintiff's complaint solely as to whether it alleges unlawful information exchange pursuant to this rule of reason.

### III. *Market Power*

#### A. *The Relevant Market*

An important factor to analyze in a *Gypsum* data exchange case is the market power of the defendants. One traditional way to demonstrate market power is by defining the relevant product market and showing defendants' percentage share of that market. Plaintiff argues that the relevant market in this case is the market for "the services of experienced, salaried, non-union, managerial, professional and technical (MPT) employees in the oil and petrochemical industry, in the continental United States and various submarkets thereof." Compl. ¶ 97. If the market is defined in this way, defendants would have a substantial market share of 80–90%. If the market cannot be limited in this way, defendants' percentage market share would drop substantially. *Cf. United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 379, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (defining product market as broader flexible packaging market instead of narrower cellophane market would lower defendant's market share from roughly 75% to less than 20%).

Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure

to plead a relevant product market. *See Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir.2001) ("Market definition is a highly fact-based analysis that generally requires discovery.") (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir.1998) (noting that "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.1997) (explaining that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers") (citing *Eastman Kodak*, 504 U.S. at 482, 112 S.Ct. 2072); *cf. Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70 n. 8 (2d Cir.1984) ("The conclusion that genuine issues of material fact preclude a finding as to [the] relevant market as a matter of law is not unexpected. It frequently has been observed that 'a pronouncement as to market definition is not one of law, but of fact ....'") (citations and alterations omitted). There is,

however, no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market. *Queen City*, 124 F.3d at 436.

■ To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a "rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand," *Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F.Supp. 1348, 1354 (S.D.N.Y.1982), and it must be "plausible." *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir.2000). Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes [3] or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.[4]

In the instant case, the district court held that "the relevant market proposed by plaintiff does not rise to the level of plausibility required in an antitrust action." *Todd*, 126 F.Supp.2d at 325. The

---

**3.** *See, e.g., Hack*, 237 F.3d at 86–87 (Yale University competes with other schools and thus is not its own product market); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063–64 (9th Cir.2001) (UCLA women's soccer program does not constitute its own market because other college programs compete to recruit student-athletes); *Queen City*, 124 F.3d at 438 (market cannot be limited to products approved by Domino's Pizza for Domino's stores); *Subsolutions, Inc. v. Doctor's Assocs.*, 62 F.Supp.2d 616, 625 (D.Conn.1999) (Subway franchise is not a distinct market from comparable franchise opportunities); *Re Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F.Supp. 387, 391–92 (S.D.N.Y.1993) (one particular brand of health education materials is not a relevant product market); *Theatre Party Assocs. v. Shubert Org.*, 695 F.Supp. 150, 153–55 (S.D.N.Y.1988) (tickets to the

play "Phantom of the Opera" are not a relevant product market); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F.Supp. 674, 678–79 (S.D.N.Y.1987) (Rolex watches clearly are interchangeable with other high quality time pieces). These cases would be applicable to this case if plaintiff were alleging that Exxon alone constitutes the relevant product market, but plaintiff does not so allege.

**4.** *See, e.g., Gianna Enters.*, 551 F.Supp. at 1354 (rejecting a market limited to international beauty pageants where plaintiff "made no attempt to explain" why the product market should be so limited); *North Jersey Secretarial Sch. v. McKiernan*, 713 F.Supp. 577, 583 (S.D.N.Y.1989) (finding that the plaintiff "fails to explain the basis" for the market alleged in the complaint).

court explained that market definition is guided by an " 'analysis of the interchangeability of use or the cross-elasticity of demand for potential substitute products.' " *Id.* (quoting *Gianna Enters.*, 551 F.Supp. at 1354). Applying the test to the instant case, the court stated that "plaintiff must plead facts which tend to show that the 'products' at issue here—MPT employees—are reasonably interchangeable or that there is a cross-elasticity of demand for potential substitutes." *Id.* The court found plaintiff's proposed market to be both over-inclusive and under-inclusive. We disagree on both counts.

### 1. Whether Plaintiff's Alleged Market Is Over Inclusive

■ The district court held that the proposed product market was over-inclusive because the plaintiff "failed to explain how it is that accountants, lawyers, chemical engineers and other MPT employees in the oil and petrochemical industry are interchangeable with one another when the jobs they perform are so different." *Id.* Defendants offer the same argument on this appeal. Indeed, plaintiff does *not* attempt to argue that such varying professionals are interchangeable. Plaintiff instead urges that the district court looked through the "wrong end of the telescope," failing to consider that "[t]his case involves the exercise of oligopsony power, that is, buying power." We agree with plaintiff that the interchangeability of these employees is not part of defining the relevant market.

■ The traditional horizontal conspiracy case involves an agreement among sellers with the purpose of raising prices to supracompetitive levels. The Sherman Act, however, also applies to abuse of market power on the buyer side—often taking the form of monopsony or oligopsony. *See* Roger D. Blair & Jeffrey L. Harrison,

*Antitrust Policy and Monopsony*, 76 Cornell L.Rev. 297, 297–301, 308 (1991). Plaintiff is correct to point out that a horizontal conspiracy among buyers to stifle competition is as unlawful as one among sellers. *See Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235, 68 S.Ct. 996, 92 L.Ed. 1328 (1948) ("It is clear that the agreement is the sort of combination condemned by the [Sherman] Act, even though the price-fixing was by purchasers, and the persons specially injured ... are sellers, not customers or consumers.") (footnotes omitted); *Nat'l Macaroni Mfrs. Ass'n v. FTC*, 345 F.2d 421, 426–27 (7th Cir.1965) (applying the *per se* rule against horizontal price fixing to an agreement by pasta producers to standardize the amount of durum wheat they used in an effort to depress the price of durum wheat). There is thus no reason to doubt that a *Gypsum* data exchange claim—a close cousin of traditional price fixing—can be brought against a group of buyers. *See Alabama Power Co. v. Fed. Power Comm'n*, 511 F.2d 383, 389 n. 10 (D.C.Cir.1974) ("Although the anticompetitive effects of information are usually discussed with reference to a market characterized by oligopoly on the supply side alone, concentration may occur among purchasing firms as well; circulation of transaction data may allow a few buyers to gain at the expense of many sellers.").

■ The fact that this case involves a buyer-side conspiracy affects how the market is defined. Normally, the market "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *AD/SAT v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999). "In economists' terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand. Cross-elasticity of de-

mand exists if consumers would respond to a slight increase in the price of one product by switching to another product." *Id.;* *see also* IIA Phillip E. Areeda et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 562a (1995). Thus, the inquiry is whether a "hypothetical cartel" would be "substantially constrain[ed]" from increasing prices by the ability of customers to switch to other producers. *AD/SAT*, 181 F.3d at 228.

There is a danger in applying these factors mechanically in the context of monopsony or oligopsony. These factors are *reversed* in the context of a buyer-side conspiracy. Blair & Harrison, *supra*, at 324; *see also* IIA Areeda et al., *supra*, ¶ 574, at 302 n. 12 (explaining that the equation for measuring market power in monopsony is a " 'mirror image' of the relationships that create market power in a seller"). In such a case, "the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes." Blair & Harrison, *supra*, at 324. A greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question. *See id.; see also* IIA Areeda et al., *supra*, ¶ 574, at 302 n. 12 (explaining that when elasticity is high in the monopsony context, "a given

price decrease engenders a relatively large increase in purchases by the fringe firms").

■ The district court's analysis reflects a failure to reverse all of the factors involved in light of the buyer-side nature of the alleged activity. Using Areeda's language, the district court's "equation" is not a complete "mirror image" of the traditional seller-side market analysis. IIA Areeda et al., *supra*, ¶ 574, at 302 n. 12. Plaintiff is right to urge that "[t]he proper focus is ... the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers." The question is not the interchangeability of, for example, lawyers with engineers. At issue is the interchangeability, from the perspective of an MPT employee, of a job opportunity in the oil industry with, for example, one in the pharmaceutical industry.[5]

## 2. Whether Plaintiff's Alleged Market is Under Inclusive

The issues discussed above overlap with the district court's under-inclusiveness argument. The district court found that "plaintiff fails to adequately explain why an antitrust lawyer employed by an oil company does not compete in the same

---

5. The observation by the district court and defendants about the large differences among the various MPT jobs is better understood not as speaking to interchangeability, but as indicating that not all MPT employees are affected by the conspiracy in the same way—thus creating potential difficulties with class certification. While interchangeability of the different types of employees is not an element of market definition in an oligopsony, the different types of employees will differ in how they must prove the interchangeability among employers. For example, as the district court and defendants point out, oil industry employers may not be interchangeable with pharma-

ceutical industry employers from the standpoint of a petroleum geologist, but the two may be more interchangeable from the standpoint of a labor lawyer. More importantly, the means of proof may be quite different; at trial the geologists must present evidence of the relative job prospects for geologists outside the oil industry, while the lawyers must explore the legal job market. That this large class might have difficulty meeting the predominance and typicality requirements for Rule 23 certification, however, does not indicate that plaintiff fails to state a claim upon which relief can be granted.

market as an antitrust lawyer at a commercial bank or in a private law firm." *Todd,* 126 F.Supp.2d at 325. Defendants make the same argument on appeal. By "underinclusive," the district court appears to mean that the market should not be limited to employers in the oil and petrochemical industry. There may be merit to the district court's argument as it relates to less specialized job categories, but this fact-specific question cannot be resolved on the pleadings. At this stage, it is sufficient that plaintiff has alleged specific facts that support a narrow product market in a way that is plausible and bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes.

Plaintiff claims that MPT employees accumulate industry-specific knowledge that renders them more valuable to employers in the oil and petrochemical industry than to employers in other industries. Plaintiff supports this contention by arguing that "[w]orkers receive compensation for skills that are specific to a set of firms that produce similar products," and thus MPT employees would "suffer large wage losses if they switch industries." According to the complaint, "[a]s the employees gain experience, the only practical outlets to sell their services at an amount reflecting the value of their experience are the integrated oil and petrochemical companies, i.e., Defendants." Compl. ¶ 115. While the complaint could perhaps be more specific about the experience that renders these employees more valuable within the oil industry, plaintiff's point is hardly counter-intuitive. It is consistent with common sense and empirical research that employees' industry-specific experience may cause them to suffer a pay cut if forced to switch industries. *See* Elisabetta Magnani, *Risk of Labor Displacement and Cross Industry Labor Mobility,* 54 Indus. & Lab. Rel. Rev. 593, 593–94 (2001) (referring to the empirical research indicating that wage losses generally accompany industry mobility). To be sure, the district court and defendants may be correct to assume that industry specificity affects certain MPT employees less than others. *Todd,* 126 F.Supp.2d at 325. Less technical jobs tend to involve skills that are not as industry-specific, creating greater cross-elasticity for these employees. *See* Bruce C. Fallick, *A Review of the Recent Empirical Literature on Displaced Workers,* 50 Indus. & Lab. Rel. Rev. 5, 12 (1996) (noting that "executives, administrators, and managers, as well as more highly educated workers" tend to have greater industry mobility than sales and production employees).

This is not to say, however, that less technical jobs require no industry-specific experience, and the extent to which they do involves a question of fact not resolvable on a Rule 12(b)(6) motion. It is not implausible that less technical MPT employees develop industry-specific expertise that affects their value in the labor market. A lawyer, for example, who works for an oil company may gain expertise on regulatory issues regarding the environment and natural resources, while a lawyer for a pharmaceutical company becomes proficient in such matters as FDA approval and warning labels.[6] While plaintiff's conten-

---

6. Even antitrust lawyers—the favorite example used by the district court and defendants—could be subject to this effect. *Todd,* 126 F.Supp.2d at 325. While defendants are correct that "there is no specialized body of antitrust law applicable only to the oil industry," antitrust involves extensive empirical re-search into the business specifics of a particular industry, and it is not inconceivable that a lawyer who has spent a career mastering the subtleties of the oil and petrochemical industry would be more valuable within that industry.

tion that it is "virtually self-evident" that employers will pay more for employees with relevant experience may oversimplify the issues of market definition in this case, it cannot be said that plaintiff's alleged market is implausible.

It may well be that the availability of employment in alternative industries places some constraints on the ability of the alleged conspirators to limit salary increases. Market definition is generally a matter of degree. Even a monopolist is subject to limitations on how far it can increase price. *See* Donald F. Turner, *Antitrust Policy and the Cellophane Case,* 70 Harv. L.Rev. 281, 308–10 (1956). In accordance with this Court's formulation in *AD/SAT,* 181 F.3d at 227–28, plaintiff is simply alleging that a slight decrease in salary by a hypothetical oligopsonist cartel in the oil/petrochemical industry would not cause MPT employees to leave the industry because they would have difficulty finding compensation fully reflecting the value of their experience elsewhere. At trial, plaintiff would have to prove this theory with economic evidence regarding the cross-industrial elasticity of MPT employees. Evidence could include information regarding, for example, the extent to which decreases in oil/petrochemical industry salaries, or increases that do not keep pace with increases in other industries, cause MPT employees to leave the industry; whether MPT employees who leave or are displaced from the oil/petrochemical industry suffer pay cuts upon switching industries;[7] and whether it takes longer for MPT employees who leave or are displaced from oil/petrochemical industry jobs to find employment in other industries

than within the same industry. The outcome of fact-intensive inquiries such as these would help the court determine whether plaintiff's proposed market can be sustained.

Defendants attempt to invoke our statement in *AD/SAT* that "[i]f the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market." *AD/SAT,* 181 F.3d at 228 (citation omitted). Defendants' reference to *AD/SAT* merely restates the test; it does not predict its outcome in this case. The fact that electronic transmission of newspaper advertisements does not constitute its own product market—the finding in *AD/SAT*—sheds little light on the fact-specific question of whether MPT employment opportunities in the oil and petrochemical industry constitute the relevant market in the instant case. It is also significant that *AD/SAT* was decided on summary judgment, not a Rule 12(b)(6) motion to dismiss, and thus the Court considered evidence such as the newspapers' use of the different transmission services and research by consultants regarding market conditions. *Id.* at 228–29; *cf. Virgin Atl. Airways Ltd. v. British Airways PCL,* 257 F.3d 256, 259 (2d Cir.2001) (affirming grant of defendant's motion for summary judgment in predatory pricing case but only "[a]fter reviewing the voluminous exhibits filed under seal in this case").

In finding that plaintiff's allegation about the industry-specific expertise of MPT employees supports a plausible product market, we do not indicate whether plaintiff will succeed in proving the alleged

---

7. Defendants, while not relying on this argument, note that plaintiff left Exxon for a higher-paying job outside the oil industry. This fact, however, is but one small piece of the broader cross-elasticity analysis. Moreover, it does not bear on plaintiff's standing, as the

alleged economic harm to plaintiff lies in her receiving an artificially low salary during the relevant time period—not in any harm she suffered upon leaving the industry. *See* Compl. ¶ 102.

market. It remains to be seen whether *every* category of MPT employee in the plaintiff class can demonstrate the requisite degree of inelasticity.[8] We find only that the allegation of a market limited to employers in the oil and petrochemical industry is plausible on its face.

### 3. *Industry Recognition*

Plaintiff also contends that defendants' own conduct and apparent perceptions support the alleged product market. The complaint alleges that defendants "perceive and recognize the relatively low level of cross-elasticity of demand for the services of MPT employees with experience in the oil and petrochemical companies ... because they rely primarily on integrated oil and petrochemical industry salary information in setting salary and wages." Compl. ¶ 99. In other words, the very fact that defendants rely on data regarding MPT salaries in the oil and petrochemical industry suggests that this is the relevant market. The complaint further alleges that defendants have gone to considerable lengths to compile the data, spending significant time and effort. *Id.* ¶¶ 61, 74, 116. Plaintiff argues that it is unlikely that defendants would do this if industry-specific experience did not have a bearing on the wages of MPT employees and, in turn, on plaintiff's alleged product market.

The district court rejected this argument, stating that it would lead to the "circuitous result that the scope of the relevant product market in any antitrust

action challenging salary exchanges would be defined by the scope of the salary exchange itself." *Todd*, 126 F.Supp.2d at 325. The district court dismissed this argument too hastily. Industry recognition is well established as a factor that courts consider in defining a market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). It is significant because "we assume that the economic actors usually have accurate perceptions of economic realities." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 n. 4 (D.C.Cir.1986). In *AD/SAT*, for example, this Court noted that the litigants themselves considered the electronic transmission of advertisements to be in competition with physical carriers, and used this information in finding that the market included both products. 181 F.3d at 228. Considering facts analogous to the instant case, the court in *Ansell Inc. v. Schmid Labs., Inc.* noted that the defendant hired a statistics compilation company to develop data on competitors' pricing. 757 F.Supp. 467, 472 (D.N.J. 1991), *aff'd w'out opinion*, 941 F.2d 1200 (3d Cir.1991). The court emphasized that the consultant "maintains its data separately for sales of latex condoms to U.S. retail outlets," and used this information in finding that this was an "economically distinct market segment" from the broader market for wholesale distribution of condoms. *Id.*[9] Such an analysis might be useful in the instant case. For example, defendants would often prepare in advance

---

**8.** For example, at oral argument defendants suggested that pilots—a category of MPT employee—may have a dubious claim of cross-industrial inelasticity.

**9.** *See also Henry v. Chloride, Inc.*, 809 F.2d 1334, 1342 (8th Cir.1987) (considering "evidence that the industry itself viewed route sales as a separate market"); *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 308 (7th Cir.1976) (finding a market limited to aerosol painting

cans where "aerosol manufacturers regard themselves as a separate industry"); *FTC v. Staples, Inc.*, 970 F.Supp. 1066, 1079–80 (D.D.C.1997) (finding that office supply superstores constitute a market distinct from other office supply stores and catalogues where defendant's own documents regarding competitive strategy "focus primarily on competition from other superstores").

certain topics for discussion at their meetings. One such question asked whether "there [is] any move to consider non-oil companies in the competitor group." Compl. ¶ 93. Discovery regarding how this question was addressed could be instructive with regard to the players' own perception of the relevant market.

The complication in this case is that the alleged violation is the information exchange itself, whereas in the above-cited cases the evidence of industry recognition was used as a means to analyze a monopolization claim or proposed merger. As a result, using the evidence in this case creates an appearance of bootstrapping—an aspect seized upon by the district court. This concern, however, does not negate the well-established probative value of defendants' perceptions in defining the market. We therefore decline to exclude evidence of industry recognition from the analysis, while recognizing that this factor alone is not dispositive of market definition in this type of case. It is merely one factor to consider in the subtle, fact-specific inquiry which focuses on the ultimate issue of cross-elasticity and interchangeability. Evidence of industry recognition, therefore, would not save an alleged market that was clearly implausible otherwise. Thus the "circuitous result" feared by the district court will not always follow. Moreover, the market power inquiry as a whole is but one part of the rule of reason analysis in a *Gypsum* data exchange case; even defendants with substantial market power will avoid liability unless the exchange meets certain criteria suggesting anticompetitiveness.

In sum, plaintiff's complaint alleges a plausible product market. The district court erred by requiring that the different MPT jobs be interchangeable with one another, by rejecting plaintiff's allegation about industry-specific experience on a Rule 12(b)(6) motion to dismiss, and by failing to consider allegations about industry recognition.

### B. *Anticompetitive Effect As an Indication of Market Power*

■ Plaintiff's alleged product market would support the 80 90% market share figure for defendants. Market power defined as a percentage market share, however, is not the only way to demonstrate defendants' ability to depress salaries. *See Toys "R" Us, Inc. v. FTC,* 221 F.3d 928, 937 (7th Cir.2000) (explaining that "the share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration"). If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power. In fact, this arguably is more direct evidence of market power than calculations of elusive market share figures. *See Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 98 (2d Cir.1998) (stating that market power "may be proven *directly* by evidence of the control of prices . . . or it may be *inferred* from one firm's large percentage share of the relevant market") (emphasis added); *Toys "R" Us,* 221 F.3d at 937 (stating that market power may be proven "through *direct* evidence of anticompetitive effects" or "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case") (emphasis added).

■ In this Circuit, a threshold showing of market share is not a prerequisite for bringing a § 1 claim. *See K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 129 (2d Cir.1995). "If a plaintiff can show an actual adverse effect on competition, such as reduced output . . . we do not require a further show-

ing of market power." *Id.* (citation omitted); *see also Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 546 (2d Cir.1993) (explaining that plaintiff may avoid a " 'detailed market analysis' by offering 'proof of actual detrimental effects, such as a reduction of output' ") (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)). If, for example, the plaintiff in this case could prove that (1) defendants engaged in information exchanges that would be deemed anticompetitive under *Gypsum* and (2) such activities did in fact have an anticompetitive effect on the market for MPT labor in the oil and petrochemical industry, we would not deny relief on the basis of market share figures. On remand, therefore, the court should consider whether plaintiff has demonstrated anticompetitive effects as part of the court's assessment of defendants' market power.

Defendants mistake this approach for the "quick look" or "truncated" rule of reason inquiry that the Supreme Court has endorsed in certain contexts. Defendants are correct to assert that in *California Dental Ass'n v. FTC* the Supreme Court limited the use of the "quick look" to cases in which the probable anticompetitive effects of the alleged conduct would be "intuitively obvious" and "easily ... ascertained" with "even a rudimentary understanding of economics." 526 U.S. 756, 759, 770, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999); *see, e.g., Indiana Dentists*, 476 U.S. at 459–60, 106 S.Ct. 2009 (agreement to withhold a particular desired service); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (agreement to refuse to discuss prices with potential customers). The alleged conduct in this case—the exchange of information—is not so inherently or intuitively anticompetitive. The Supreme Court has said as much and

specifically prescribed a full rule of reason. *See Gypsum*, 438 U.S. at 441 n. 16, 98 S.Ct. 2864 ("The exchange of price data and other information among competitors does not invariably have anti-competitive effects...."). We do not suggest that the district court can avoid conducting a full analysis of the pro—and anticompetitive characteristics of the arrangement in this case.

The use of anticompetitive effects to demonstrate market power, however, is not limited to "quick look" or "truncated" rule of reason cases. This Court's precedents discussed above were not "quick look" cases; they merely accepted alternative ways of demonstrating market power. *See K.M.B. Warehouse*, 61 F.3d at 127 (applying rule of reason); *Capital Imaging*, 996 F.2d at 545–46 (applying rule of reason); *Tops Mkts.*, 142 F.3d at 98–99 (analyzing market power in the context of a § 2 monopolization claim); *see also United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir.1993) (stating that under the "traditional" rule of reason a "plaintiff may satisfy [its] burden by proving the existence of actual anticompetitive effects, such as reduction of output [or] increase in price") (citation omitted). The question of whether plaintiff has alleged adverse effects on competition and antitrust injury sufficient to survive a Rule 12(b)(6) motion is addressed *infra* Part VI.

## IV. *Susceptibility of the Market*

■■■■ The Supreme Court in *Gypsum* explained that one of the two "most prominent[ ]" factors in the rule of reason analysis of a data exchange is "the structure of the industry involved." 438 U.S. at 441 n. 16, 98 S.Ct. 2864. Therefore, once the relevant market is defined, a court must analyze the structure of that market to determine whether it is "susceptible to the exercise of market power

through tacit coordination." *Todd,* 126 F.Supp.2d at 326 (citing *Battipaglia,* 745 F.2d at 174–75). As the district court explained, "[s]usceptible markets tend to be highly concentrated—that is, oligopolistic—and to have fungible products subject to inelastic demand." *Id.* (citing *Battipaglia,* 745 F.2d at 174–75). These factors are addressed in turn.

### A. Concentration

■ Generally speaking, the possibility of anticompetitive collusive practices is most realistic in concentrated industries. If the relevant market in this case is defined as the plaintiff contends, the defendants would control collectively a 80–90% market share. *Todd,* 126 F.Supp.2d at 323. While this is an extremely high market share by any measure, *see Tops Mkts.,* 142 F.3d at 99, the district court contends that the alleged market "is not, as plaintiff contends, so clearly oligopolistic," *Todd,* 126 F.Supp.2d at 327. The district court points out that there are fourteen defendants in this case, and that this is not a concentrated market under the Department of Justice Merger Guidelines. *Id.* That the market would not be deemed highly concentrated by this measure, however, does not preclude the possibility of collusive activity. *See In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,* 906 F.2d 432, 444 (9th Cir.1990). The Merger Guidelines index

"cannot capture the full range of factors bearing upon the existence or strength of recognized interdependence." *Id.* (quoting VI Phillip E. Areeda, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1431a, at 183 (1986)).

The Supreme Court has found that data exchange can be unlawful despite a relatively large number of sellers. In *Container Corp.,* the Court used the oft-cited language that the industry was "dominated by relatively few sellers." 393 U.S. at 337, 89 S.Ct. 510. But in fact, the defendants in *Container Corp.* were eighteen firms controlling 90% of the market, defined as the sale of cardboard cartons in the Southeast. *Id.* at 342, 89 S.Ct. 510 (Marshall, J., dissenting). The Court nonetheless found the market sufficiently concentrated to support the finding of a violation. *Id.* at 334–38, 89 S.Ct. 510.[10] It is fairly clear that the reason the Court reached its holding despite the multiplicity of sellers was the specific anticompetitive characteristics of the information exchange. Given that the market concentration in this case is not radically different from that in *Container Corp.,*[11] and given that concentration is part of a rule of reason inquiry that also emphasizes the nature of the information exchanged, we do not think that fourteen companies sharing an 80–90% market share is so unconcentrated as to warrant a Rule 12(b)(6) dismissal where the nature of

---

**10.** Likewise, in *Sugar Institute* the Court found a violation involving data exchange among 15 companies holding 70 80% of the market, although the specific violation was limited to the agreement among defendants not to offer secret concessions below the announced prices. 297 U.S. at 572, 601–02, 56 S.Ct. 629.

**11.** We are not persuaded by defendants' attempt to distinguish *Container Corp.* on the basis that the six largest firms in that case controlled 60% of the relevant market. Even

as a mathematical matter, the difference pointed out by defendants is not overwhelming. If we assume that the market in this case is as unconcentrated as possible—that is, each of the 14 defendants has an equal market share and the rest of the market is fragmented—the six "largest" firms could still have nearly a 40% market share based on the allegations in the complaint. This difference between *Container Corp.* and the instant case cannot support a Rule 12(b)(6) dismissal under the circumstances of this case.

the exchanges appears anticompetitive.[12] We also find it unsurprising that data exchange cases may involve a number of participants that begins to push the boundaries of oligopoly. These players are *most* in need of such data exchange arrangements in order to facilitate price coordination; a very small handful of firms in a more highly concentrated market may be less likely to require the kind of sophisticated data dissemination alleged in this case.

### B. *Fungibility*

The district court also asserted that "even if the proposed market were oligopolistic, plaintiff still could not establish its susceptibility to the exercise of market power through tacit coordination. The 'products' in her proposed market are, as discussed above, far from fungible." *Todd,* 126 F.Supp.2d at 327. The district court apparently refers to its previous discussion of interchangeability, wherein it argued that the various types of jobs included in the MPT category are vastly different from one other. *Id.* at 325.

It is important to bear in mind the context in which the fungibility question arises. The inquiry is one part of the question of whether the market is susceptible to the exercise of market power though tacit coordination. Fungibility is relevant on this point because it is less realistic for a cartel to establish and police a price conspiracy where it is difficult to compare the products being sold. *See*

Donald S. Clark, *Price–Fixing Without Collusion: An Antitrust Analysis of Facilitating Practices After Ethyl Corp.,* 1983 Wis. L.Rev. 887, 896 (1983) (explaining how product heterogeneity makes it difficult for a cartel to achieve a consensus). In contrast, "[f]ungible products facilitate coordination of pricing in a concentrated industry because it is easier to determine and monitor a consensus on some competitive variable." Brian R. Henry, *Benchmarking and Antitrust,* 62 Antitrust L.J. 483, 496 (1994). Therefore, fungibility plays a significant role in evaluating the anticompetitive potential of an information exchange.

The question in this case is whether jobs at the various oil and petrochemical companies were comparable, or fungible enough so that the defendants could have used the exchanged information as part of a tacit conspiracy to depress salaries. *Compare Gypsum,* 438 U.S. at 426, 98 S.Ct. 2864 (gypsum board is fungible), *Container Corp.,* 393 U.S. at 337, 89 S.Ct. 510 (corrugated containers are fungible), *and Flav–O–Rich, Inc. v. N.C. Milk Comm'n,* 593 F.Supp. 13, 15 (E.D.N.C. 1983) (milk is fungible), *with Stephen Jay Photography, Ltd. v. Olan Mills, Inc.,* 713 F.Supp. 937, 944–45 (E.D.Va.1989) (yearbook photographers competed primarily on basis of quality not price and thus the product was not fungible), *and Rosefielde v. Falcon Jet Corp.,* 701 F.Supp. 1053, 1066 (D.N.J.1988) (business jets are not fungible).

---

**12.** We reach a similar conclusion as did the Ninth Circuit when it analyzed the oil industry in a case alleging gasoline price fixing aided by the public dissemination of price information by 13 named defendants. *See In re Coordinated,* 906 F.2d at 436. The court recognized that the market would not be deemed highly concentrated under the Merger Guidelines, but nonetheless concluded that "[t]he gasoline markets under discussion here appear to lie in that gray area where, although not altogether inevitable, interdependence is distinctly possible." *Id.* at 444; *see also Five Smiths, Inc. v. Nat'l Football League Players Ass'n,* 788 F.Supp. 1042, 1054 (D.Minn.1992) (distinguishing *In re Coordinated* from the facts before the court partly on the basis that "the structure of the gasoline market [was] well within the parameters set by the Supreme Court in *Container Corp.*").

As an initial matter, the district court's discussion about the clear differences among the various types of MPT jobs is inapposite. Plaintiff alleges that the information exchanged by defendants related to specific job categories—not to MPT employment in general. Compl. ¶¶ 50–66. Therefore, the fact that a job as an attorney and one as a geologist are not comparable does not bear on the ability of defendants to coordinate salaries. Rather, the relevant question is whether jobs *within* each category are fungible enough across the oil and petrochemical industry to allow for such coordination.

One might argue that the jobs still are not fungible—even within each category of MPT employee. Varied jobs in a complex industry are far less fungible than, say, a product such as corrugated containers. Services generally tend not to be fungible or susceptible to standardization, *see* Clark, *supra*, at 938, and it is unlikely that these fourteen different companies would have positions with job descriptions that precisely match one another. Even this argument, however, is complicated by the specific facts of this case, coupled with the policy rationale behind the fungibility inquiry.

Plaintiff's complaint alleges in detail the sophisticated techniques defendants used to "achieve a common denominator" with respect to the compensation paid to their MPT employees. Compl. ¶ 50. Defendants developed the Job Match Survey because they "realized it was not functionally efficient simply to know what each others' employees were being paid unless they were able to horizontally match the various job classifications." *Id.* The survey revolved around certain benchmark jobs provided by Chevron. The defendants would submit detailed information relating to the jobs most nearly comparable to the benchmark jobs so that they could be matched. "A 'match' is defined as a similar job in a similar organization whose combined reporting functions and scope adjustments are not more than two survey salary grades above or below the benchmarked job." *Id.* ¶ 51. Plaintiff alleges that, during the relevant time period, Exxon was able to match 70–80% of its jobs to the 155 Chevron benchmark positions. *Id.* ¶¶ 62–63. Furthermore, because not all jobs could be matched precisely, the defendants agreed upon certain "offsets" reflecting the specific differences between jobs as a percentage figure. *Id.* ¶ 53. For purposes of the survey, each grade level was assumed to have a salary difference of 14% at its midpoint. The offset factor assigned to each job was thus stated as a fraction of 14%—a positive fraction for jobs with greater responsibilities than the Chevron benchmark job and a negative fraction for jobs with lesser responsibilities. *Id.* ¶¶ 53–54. Defendants even devised a formula to enhance the comparability of non-cash benefits afforded to MPT employees in their Long Term Incentive Survey. *Id.* ¶ 83.

Plaintiff is thus on solid ground when she argues that defendants "made their own employees' positions 'fungible' for comparison purposes with those of their competitors." The jobs in question may not be inherently fungible, but since the purpose of the fungibility inquiry is to test whether defendants would be able to compare the positions for coordination purposes, the sophisticated techniques employed by defendants to account for the differences among jobs are extremely telling. *See* VI Areeda, *supra*, ¶ 1435b, at 224 ("[A]greed steps might be taken to reduce the product or transactional variety that impedes rivals' ability to match product variations, to compare transactions, or to detect 'cheating' from parallel uniformity.").

## C. *Inelastic Demand*

Concluding its discussion of the susceptibility of the market to tacit coordination, the district court stated that "plaintiff has pleaded no facts tending to establish that the demand for these 'products' is inelastic." *Todd,* 126 F.Supp.2d at 327. We disagree. This part of the inquiry, easily confused with the cross-elasticity and interchangeability analysis that is used to define the relevant market, traditionally asks whether demand is inelastic because "buyers place orders only for immediate, short-run needs." *Container Corp.,* 393 U.S. at 337, 89 S.Ct. 510; *see also, e.g., Flav–O–Rich,* 593 F.Supp. at 15 ("With the obvious short-term life span of milk, orders are, by necessity, placed on the basis of short-term needs."). In other words, the question is whether it is economically feasible for buyers to abstain from purchasing the product for some period of time.

Here again, we reverse the equation in the context of an oligopsony. Where market power is exercised by buyers, it is the elasticity of the sellers' *supply* that is at issue. Sellers' supply could be elastic if, for example, they have "the option of withholding some output from the market in hopes of higher prices in future years." Blair & Harrison, *supra,* at 313. If, however, the goods are perishable, short-run supply may be quite inelastic. *Id.* In this case, the supply at issue is the labor of the MPT employees. "Labor is an extremely perishable commodity—an hour not worked today can never be recovered." *Id.* at 314. As a result, "[c]ollusion among employers can drive the wage down to the individual's reservation wage." *Id.* As labor is a classic example of inelastic supply flow, it is unclear what additional facts plaintiffs would have to allege with regard to this aspect of the inquiry.

In sum, the pleadings support the contention that the market was susceptible to tacit coordination by the defendant companies: The market is sufficiently concentrated under *Container Corp.;* the defendants have in effect manufactured a form of fungibility through sophisticated comparison techniques; and the supply of labor has an inherently inelastic quality.

## V. *The Nature of the Information Exchanged*

■ Alongside the "structure of the industry involved," the other major factor for courts to consider in a data exchange case is the "nature of the information exchanged." *Gypsum,* 438 U.S. at 441 n. 16, 98 S.Ct. 2864. There are certain well-established criteria used to help ascertain the anticompetitive potential of information exchanges. As part of the analysis, a court should consider, "broadly speaking, whether it was of the sort in *American Column & Lumber Co. v. United States* ... or of that in *Maple Flooring Manufacturers Ass'n v. United States.*" *Battipaglia,* 745 F.2d at 175 (citations omitted). Applying the relevant criteria reveals anticompetitive potential in this case.

■ The first factor to consider is the time frame of the data. The Supreme Court has made clear that "[e]xchanges of current price information, of course, have the greatest potential for generating anticompetitive effects and although not *per se* unlawful have consistently been held to violate the Sherman Act." *Gypsum,* 438 U.S. at 441 n. 16, 98 S.Ct. 2864 (citing *Am. Column & Lumber; Am. Linseed Oil Co.;* and *Container Corp.*). The exchange of past price data is greatly preferred because current data have greater potential to affect future prices and facilitate price conspiracies. By the same reasoning, exchanges of future price information are considered especially anticompetitive.

*See, e.g., Am. Column & Lumber*, 257 U.S. at 398–99, 42 S.Ct. 114.

Plaintiff's complaint alleges that defendants exchanged past and current salary information, as well as future salary budget information. It claims that there has been an:

> exchange among Defendants of massive amounts of extremely detailed information concerning job classifications, salaries, bonuses, and benefits paid, or to be paid, to categories of employees within the different job classifications; starting salaries of new employees; "signing bonuses"; relocation expenses, stock options; and related information.... Updated information on salaries is exchanged in oral and written communications throughout the year.

Compl. ¶ 2. Most prominently, the Job Family Survey coordinated by Exxon gathered information regarding the salaries paid for specific types of work to employees with particular experience levels and academic backgrounds. *Id.* ¶¶ 69–75. "This survey sought and obtained current data on the actual compensation paid by defendants to employees in various 'job families.' The information gathered was distributed to the survey participants several times a year." *Todd*, 126 F.Supp.2d at 323 n. 5. Meanwhile, the Starting Salary Survey gathered information from the Six Majors measuring starting salaries of college graduates entering MPT positions. Compl. ¶¶ 84–85. Defendants also attended meetings at least three times per year at which various types of salary information were discussed. *Id.* ¶ 87. "Among

the information exchanged at these meetings [were] current and future increases in Defendants' salary budgets." *Id.* ¶ 88.[13]

In addition to the time frame, another factor courts look to is the specificity of the information. Price exchanges that identify particular parties, transactions, and prices are seen as potentially anticompetitive because they may be used to police a secret or tacit conspiracy to stabilize prices. *See, e.g., Container Corp.*, 393 U.S. at 334–38, 89 S.Ct. 510. Courts prefer that information be aggregated in the form of industry averages, thus avoiding transactional specificity. *Compare Maple Flooring*, 268 U.S. at 573–74, 45 S.Ct. 578 (statistical reports of average prices found lawful), *with Am. Column & Lumber*, 257 U.S. at 410, 42 S.Ct. 114 (violation found where exchanged information provided specific details of transactions).

Two aspects of the information exchange at issue are problematic in this regard. First, although the salary information was aggregated and distributed by a third-party consulting firm, companies participating in the Job Family Survey received compensation data broken down to subsets consisting of as few as three competitors. Compl. ¶ 70. Plaintiff alleges that these periodically updated data sets were used by each defendant to determine whether the announced budgets of its competitors had in fact been implemented so that each could consider what adjustments should be made to coordinate salaries. *Id.* ¶ 76. This practice, plaintiff argues on appeal, made "deviations from previously an-

---

**13.** Also problematic is the ABC Survey (Above Base Compensation). This survey was designed to capture data regarding bonus payments above base compensation that were not being captured in the Job Match and Job Family Surveys. Compl. ¶ 80. Similarly, the "B 1" and "B 2" surveys collected additional information from defendants regarding bo-

nuses and other non-standard payments. *Id.* ¶ 82. These surveys have anticompetitive potential, as they bear earmarks of practices designed to police a conspiracy by preventing "cheating"—analogous to sellers who share information targeting off-list discount sales by competitors.

nounced salary levels easily and quickly detectable." Second, at their meetings defendants discussed current and future salary budgets, including "company-specific" information, such that "all participants learn where each other participant is going with its salary budget for the upcoming year or, if a participant's salary year had only recently begun, for that new year." *Id.* ¶ 88.

Another important factor to consider in evaluating an information exchange is whether the data are made publicly available. Public dissemination is a primary way for data exchange to realize its procompetitive potential. For example, in the traditional oligopoly (seller-side) context, access to information may better equip buyers to compare products, rendering the market more efficient while diminishing the anticompetitive effects of the exchange. *See* Clark, *supra,* at 903. A court is therefore more likely to approve a data exchange where the information is made public. *See, e.g., Maple Flooring,* 268 U.S. at 573–74, 45 S.Ct. 578 (finding no violation where exchanged information was widely disseminated to the public); *Sugar Inst.,* 297 U.S. at 604–05, 56 S.Ct. 592 (affirming district court's remedial decree requiring public dissemination of the information gathered); *Wilcox v. First Interstate Bank of Or.,* 815 F.2d 522, 526 (9th Cir.1987) (finding no violation and distinguishing *Container Corp.* on the basis that the information dissemination was public).

In the instant case, dissemination of the information to the employees could have helped mitigate any anticompetitive effects of the exchange and possibly enhanced market efficiency by making employees more sensitive to salary increases. No such dissemination occurred, however. The information was not disclosed to the public nor to the employees whose salaries were the subject of the exchange. Compl.

¶¶ 3, 90. Plaintiff alleges that "[t]he confidential treatment of the information exchanged impedes the ability of employees to bargain intelligently and competitively with the members of the information exchange." *Id.* ¶ 3.

A final troubling aspect of the arrangement at issue is the fact that the defendants allegedly participated in frequent meetings to discuss the salary information, *id.* ¶ 87, accompanied by assurances that the participants would primarily use the exchanged data in setting their MPT salaries, *id.* ¶ 106. Meetings, of course, are not inherently unlawful but in this context they have the potential to enhance the anticompetitive effects and "likelihood of . . . uniformity" caused by information exchange. VI Areeda, *supra,* ¶ 1435b, at 224; *see also, e.g., Am. Column & Lumber,* 257 U.S. at 396–97, 411–12, 42 S.Ct. 114 (finding violation where defendants held frequent meetings where potentially anticompetitive information was discussed). Meanwhile, the frequency of the meetings is itself problematic for the same reason that the exchange of current price data is suspect: It tends to facilitate the policing of price conspiracies.

In sum, the "nature of the information exchanged" weighs against the motion to dismiss. The characteristics of the data exchange in this case are precisely those that arouse suspicion of anticompetitive activity under the rule of reason.

VI. *Effect on Competition and Antitrust Injury*

▮ An antitrust plaintiff must allege not only cognizable harm to herself, but an adverse effect on competition market-wide. *See Elecs. Communications Corp. v. Toshiba Am. Consumer Prods., Inc.,* 129 F.3d 240, 242 (2d Cir.1997). In the traditional oligopoly case, horizontal coordination may inflate prices to supracompetitive

levels. In an oligopsony, the risk is that buyers will collude to depress prices, causing harm to sellers. However, information exchange is not always anticompetitive and can enhance competition by making competitors more sensitive to each other's price changes, enhancing rivalry among them. *See Gypsum*, 438 U.S. at 441 n. 16, 98 S.Ct. 2864; *Maple Flooring*, 268 U.S. at 582–83, 45 S.Ct. 578.

The complaint in this case, however, points to anticompetitive effects the exchanges have had on MPT salaries market-wide, most particularly with respect to Exxon. Plaintiff specifically alleges that salary levels across the integrated oil and petrochemical industry have been artificially depressed because the information exchange has reduced competitive incentives. Compl. ¶¶ 102–103. Moreover, Exxon has supposedly used the information to reduce its competitive factor from 6.5% in 1991 to 0% in 1995, *id.* ¶ 109, to reduce its salaries 4.1% between 1987 and 1994 in comparison to the Six Majors, *id.* ¶ 75, and to reduce its salary index in relation to the competition from 110.7% in 1987 to 107.0% in 1993, *id.* ¶¶ 89, 113. In her claim for relief, plaintiff again alleges that she received compensation "materially below" what she would have received in an "uncontaminated marketplace." *Id.* ¶¶ 128, 132.

The district court found that the pleadings support, if anything, an inference that "each defendant oil company used the information exchanged to stake out an optimal competitive level for its MPT salaries." *Todd*, 126 F.Supp.2d at 327. The district court interprets the decrease in the competitive factor as "indicat[ing] that Exxon was *raising* its salaries to meet the competition." *Id.* The court concludes that "[r]aising salary levels to meet the competition and attract highly qualified employees is certainly not evidence of a conspira-

cy to restrain trade." *Id.* We read the complaint differently. The fact that Exxon increased its salaries each year would not defeat an allegation that those increases were lower than they would have been but for a conspiracy to stabilize prices. We understand the complaint as alleging a market where Exxon's salaries and those of the Six Majors continue to increase, but where the difference grows gradually smaller—a portrait of market stabilization.

Plaintiff further claims that information exchanged at the meetings among defendants and in the "Advancement Guides" created by defendants were used by Exxon "to 'slow down' its employee advancement rates, reduce the payments made to the uppermost members of some of its employee classifications, and lower the top classification levels for most of its job families." Compl. ¶ 89. According to the complaint, "[t]he result has slowed the advancement rate at Exxon by two to eight years." *Id.* ¶ 79.

In all, plaintiff alleges that with Exxon's total salary budget at $800 million, the conduct described in the complaint had the effect of lowering Exxon's MPT salaries by a total of $20 million per year. *Id.* ¶ 113. Whether this is so is a question of fact that cannot be resolved on this Rule 12(b)(6) motion. Plaintiff will have to make a substantial presentation of evidence to support her claim that salaries would have been higher without the information exchange. Furthermore, we agree with plaintiff that the economic effects of the arrangement with respect to the other defendants is an appropriate matter for discovery.

## CONCLUSION

For the reasons stated, we vacate the district court's grant of defendants' Rule

12(b)(6) motion to dismiss and remand for proceedings consistent with this opinion.