In the

# United States Court of Appeals
## For the Seventh Circuit

No. 09-1152

OMNICARE, INC.,

*Plaintiff-Appellant*,

*v.*

UNITEDHEALTH GROUP, INC.,
PACIFICARE HEALTH SYSTEMS, INC.,
and RXSOLUTIONS, INC., d/b/a
PRESCRIPTION SOLUTIONS,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 6235—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED NOVEMBER 13, 2009—DECIDED JANUARY 10, 2011

Before KANNE and TINDER, *Circuit Judges*, and
GRIESBACH, *District Judge.*[*]

---

[*] The Honorable William C. Griesbach, United States District
Judge for the Eastern District of Wisconsin, sitting by designa-
tion.

TINDER, *Circuit Judge.* In the months leading up to the 2006 launch of Medicare Part D, institutional pharmacy Omnicare entered into separate service contracts with merging Medicare Part D plan sponsors UnitedHealth Group and PacifiCare. The terms of the UnitedHealth Group contract were favorable to Omnicare; the terms of the PacifiCare contract, which Omnicare signed without negotiation, were significantly less so. Shortly after the UnitedHealth Group-PacifiCare merger was finalized, UnitedHealth Group abandoned its contract with Omnicare and joined PacifiCare's. Omnicare cried foul and filed a Sherman Act claim, alleging that UnitedHealth Group and PacifiCare conspired to depress the rate of reimbursement it would receive. It also raised a host of additional claims, including state antitrust claims and common law fraud, conspiracy to commit fraud and unjust enrichment claims. The district court granted summary judgment to the insurers and denied Omnicare's cross motion for partial summary judgment. Omnicare appeals, and we affirm.

## I. Background

Plaintiff-appellant Omnicare is the nation's largest institutional pharmacy. It provides pharmaceutical services to long-term care facilities, such as nursing homes, in 47 states. Defendant-appellee UnitedHealth Group ("United") is a large national provider of health insurance. It acquired defendant-appellee PacifiCare, a smaller, California-based health insurer, on December 20, 2005. As part of that acquisition, United also became the

owner of PacifiCare's wholly owned subsidiary, defendant-appellee RxSolutions, a "pharmacy benefits manager" ("PBM") that negotiates contracts with pharmacies and processes claims from plan members. *See In re Pharmacy Benefits Managers Antitrust Litig.*, 582 F.3d 432, 434 (3d Cir. 2009) (describing PBMs).

United and PacifiCare began their merger talks in early 2005, while each was developing an individual Medicare Part D plan proposal. Medicare Part D, a new government-subsidized prescription drug program for seniors and disabled individuals, was scheduled to "go live" on January 1, 2006, and the Centers for Medicare and Medicaid Services ("CMS") required private insurers to submit their plan proposals for consideration by August 1, 2005. Insurers whose plans were approved would be permitted to enter into contracts with CMS and begin providing benefits to Medicare Part D enrollees in January 2006. Before their plans could be approved, plan sponsors had to demonstrate to CMS that they had in place pharmacy networks capable of serving their anticipated enrollees. To assemble these networks, which had to include enough retail and institutional pharmacies to provide "convenient access" for enrollees, including Medicaid-eligible individuals who would be randomly assigned to Part D plans in late 2005, plan sponsors had to negotiate reimbursement contracts with numerous pharmacies. Both United and PacifiCare were negotiating contracts with Omnicare during the period of due diligence preceding their merger.

PacifiCare employed its in-house PBM RxSolutions to conduct its negotiations with Omnicare. By all

accounts the negotiations did not proceed smoothly. In early June 2005, RxSolutions sent to Omnicare a copy of PacifiCare's "any willing provider" contract, a form contract that CMS required Part D plan sponsors to develop and make available to any pharmacy willing to sign it. Omnicare in turn sent RxSolutions its own form contract, which included eighteen "Patient Protections" that Omnicare developed to address the special needs of long-term care patients. Omnicare and RxSolutions attempted to negotiate, but because each insisted on using its own form contract as the starting point they never made it out of the gate. By mid-July, eight days after United and PacifiCare signed their formal merger agreement, negotiations between Omnicare and Pacifi-Care broke down completely when PacifiCare, citing price concerns, walked away from the table. Omnicare assured PacifiCare that it would "stand ready to negoti-ate," but PacifiCare eschewed Omnicare's overtures and submitted its Part D bid to CMS without Omnicare in its pharmacy network. After its application was rejected, PacifiCare reopened negotiations with other pharmaceutical service providers, including Omnicare's competitor Managed Healthcare Associates, Inc., to remedy deficiencies in its pharmacy network. PacifiCare secured CMS approval for its Part D plan in Septem-ber 2005 without Omnicare in its network.

United also enlisted the assistance of a PBM, Walgreens Health Initiatives ("WHI"), to negotiate with Omnicare on its behalf. After some back-and-forth over reimburse-ment rates, WHI and Omnicare were able to agree on a contract under which Omnicare would provide pharma-

ceutical services to United's Part D enrollees who lived in Omnicare-contracted long-term care facilities. United, to whom the enrollees would pay their premiums, would then reimburse Omnicare at a rate of AWP-12% plus a fixed dispensing fee per prescription filled.[1] This reimbursement rate was comparable to the rates Omnicare negotiated with most other health insurers. The United-Omnicare contract, which was executed on July 29, 2005, included Omnicare's eighteen "Patient Protections." United submitted its bid to CMS, with Omnicare in its pharmacy network, and received approval to operate an extensive Part D plan. Shortly after signing its contract with Omnicare and securing CMS approval, how-

---

[1] "AWP" stands for "average wholesale price," which is the published price a pharmacy is supposed to pay when it acquires a drug from a wholesaler. The actual prices pharmacies pay are typically lower than AWP, which has been characterized as a suggested retail price and likened to a "sticker price" on a new car. *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 165 (1st Cir. 2009). Appellees report that the average pharmacy actually pays wholesalers AWP-22% for prescription drugs. Assuming this number is accurate for the sake of example, Omnicare would pay $78 to get a drug with an AWP of $100, but would be reimbursed $88, plus a per-transaction dispensing fee, when it sold the drug to a United Part D plan enrollee. It is in Omnicare's interest to maximize its reimbursement rate by negotiating a low percentage discount from AWP and a high dispensing fee. It contrast, it is in United's (and other insurers') interest to minimize the rate it pays to Omnicare by negotiating a high percentage discount from AWP and a low dispensing fee.

ever, United enlisted outside counsel to advise it on the legality of the "Patient Protections" and other Omnicare-engineered provisions in the contract. It did not apprise Omnicare of its concerns and expressly forbade its PBM from doing so.

While the Part D network negotiations and proposal developments were winding down, the merger between United and PacifiCare was picking up. Both insurers had due diligence teams in place, and by early June 2005, the teams were meeting regularly to discuss a variety of topics, including PacifiCare's plans for its Part D program. United tried to assuage its concerns about PacifiCare's Part D readiness by giving PacifiCare a list of "Part D Questions" to answer. In its responses, PacifiCare revealed that its expected reimbursement rate for network pharmacies was AWP-16%. PacifiCare also provided United with a copy of its standard "any willing provider" form contract.

An actuary employed by a United affiliate met with PacifiCare representatives in early July 2005 to discuss the potential financial risks associated with Part D. At the meeting, PacifiCare disclosed its projected national average bids for its Part D plans. The actuary in turn provided, in a sealed envelope that was addressed to a PacifiCare executive who was not present, corresponding information concerning United's projected Part D plans. Following the meeting, the actuary prepared a written summary of the actuarial risks associated with PacifiCare's projected Part D strategy and then disqualified himself from further Part D involvement. United's

board approved the acquisition in short order after being briefed on the actuary's summary, and PacifiCare and United executed a formal merger agreement on July 6, 2005. The merger agreement included a provision barring PacifiCare from entering contracts under which it would incur liabilities of more than $3 million prior to the consummation of the merger; a contemporaneous "company disclosure letter" also in the record (and re-ferred to in the merger agreement) explicitly exempted Part D contracts from that prohibition.

After the merger agreement was signed, but before the deal closed, United and PacifiCare discussed how they might integrate their operations if the merger were approved by the Department of Justice's Antitrust Division. (The merger was ultimately approved on December 20, 2005, after United and PacfiCare divested them-selves of some overlapping holdings.) In September 2005, PacifiCare and United executives began colla-borating on a memorandum (the "strategic options memo" or "SOM") entitled "United Health Group's Pharmacy Management Options." The SOM outlined various "strategic options" that the merged entities could eventually take with regard to RxSolutions, Pacifi-Care's in-house PBM. One of the suggestions made in the SOM was to use RxSolutions "as a stalking horse to obtain the best service and contracts." Several iterations of the SOM were circulated among United and Pacifi-Care executives from September 2005 until at least January 2006. Although the "stalking horse" language was present in all the drafts, it was used in connection with different strategic options as the SOM evolved. The

very first circulated draft of the SOM was attached to a lengthy e-mail in which a PacifiCare executive proposed discussing unspecified "sensitive items voice to voice" with a United executive.

United and PacifiCare's internal communications were not known to Omnicare at the time, but their merger was widely publicized. *See, e.g.*, Milt Freudenheim, *United-Health to Buy PacifiCare in Push into Medicare*, N.Y. Times, July 7, 2005, at C1; Vanessa Fuhrmans, Dennis K. Berman & Rhonda Rundle, *Two Health Plans Agree on a Deal for $8.1 Billion—UnitedHealth Adds Heft in California and Medicare with move on PacifiCare*, Wall St. J., July 7, 2005, at A1. Indeed, when Omnicare "became concerned that PacifiCare-insured patients in [long-term care facilities] serviced exclusively by Omnicare would be unable to obtain their medications after January 1, 2006" because Omnicare and PacifiCare still lacked a contract, it reached out to United, not PacifiCare. In mid-October, Omnicare's Senior Vice President of Professional Services and Purchasing, Tim Bien, sent an e-mail to United, asking, "When the deal closes, will PacifiCare be contracted with Omnicare as a result of the acquisition?" Craig Stephens, Vice President of Industry Relations and Networks at United, received the e-mail and forwarded it to United's in-house counsel, commenting, "Interesting—should we assume PacifiCare has not agreed with Omnicare?" Stephens also conferred with some United executives, two of whom Omnicare alleges had access to PacifiCare's Part D pricing information and contracting strategy, before sending Bien a reply e-mail on October 31. The reply stated in its entirety, "Pacifi-

Care's Part D offering for 2006 is a unique contract with CMS. If and when the deal closes, PacifiCare will follow their own Part D product strategy throughout the 2006 calendar year." Bien forwarded this reply to Omnicare's CEO, adding, "PacifiCare will not be included with the United Part D offering."

Omnicare concluded from Stephens's response that it would need a separate contract with PacifiCare if it wanted to serve PacifiCare's Part D enrollees. It then took the unusual step of approaching PacifiCare, through its agent RxSolutions, to reopen negotiations in November 2005. (Most other insurers who did not initially contract with Omnicare later approached Omnicare if they wanted to add Omnicare to their pharmacy networks.) Omnicare asked PacifiCare for its best offer. PacifiCare, whose pharmacy network had already been approved by CMS, told Omnicare that its negotiating position had not changed and responded by sending Omnicare another copy of its "any willing provider" contract. Omnicare did not send PacifiCare its own form contract, make a counteroffer, propose the addition of any of its eighteen "Patient Protections," or otherwise seek to negotiate any contractual terms with PacifiCare. Its CEO instead simply signed PacifiCare's "any willing provider" contract on December 6, 2005, two weeks before the United-PacifiCare merger formally closed. Under this contract, Omnicare's reimbursement rate was fixed at AWP-16% plus a relatively low dispensing fee; this reimbursement rate was the lowest rate Omnicare contracted for with any national pharmacy but was higher than the rates it contracted for with at least three small pharmacies.

Two days after Omnicare signed the PacifiCare contract, United, at a scheduled meeting, finally informed Omnicare of its concerns about the "Patient Protections" contained in its contract. United—without the aid of WHI—then reopened negotiations with Omnicare in an attempt to get the "Patient Protections" excised from the contract. The negotiations reached an impasse in January 2006, several weeks after the United-PacifiCare merger was complete. At that point, United's Craig Stephens e-mailed a PacifiCare employee, asking, "Quick question— do you have a Part D network with Omnicare for [institutional] pharmacy?" The PacifiCare employee responded affirmatively, and the two met to discuss the matter. After that discussion, Stephens e-mailed United's in-house counsel: "I learned . . . yesterday that [PacifiCare] has a favorable agreement in place with Omnicare. We need to understand if we can utilize the agreement for our business—this may offer a different approach we can take with Omnicare."

The PacifiCare-Omnicare agreement contained a provision that allowed PBM RxSolutions to add new clients to the agreement without obtaining consent from Omnicare. It also lacked Omnicare's "Patient Protections" and included a far lower reimbursement rate than the one United was presently required to pay Omnicare under the WHI-negotiated contract. (It did, however, include a provision that allowed Omnicare to terminate the contract with or without cause upon 180 days' written notice.) United informed Omnicare in late February 2006 that, as a newly minted RxSolutions client, it was going to join the PacifiCare-Omnicare contract, effective April 1, 2006.

Omnicare was dissatisfied with this turn of events, which would place more than one-third of its Part D business under the governance of a pro-insurer contract. It threatened United with legal action. United expressed its desire to cultivate a "long-lasting relationship with Omnicare" and agreed to provide Omnicare with a higher reimbursement rate through April while the parties tried to reach a contractual middle ground. Nevertheless, the parties' negotiations over future reimbursement rates and other contract terms quickly soured. Omnicare followed through on its threat of legal action by filing this suit in May 2006.

In its complaint, originally filed in the Eastern District of Kentucky, where its corporate headquarters are located, Omnicare alleged that United, PacifiCare, and RxSolutions (collectively "Defendants") violated the Sherman Antitrust Act, 15 U.S.C. § 1, and a parallel state statute, the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.175. Omnicare alleged that Defendants formed a "buyers' cartel" in which they shared information and conspired to gain a competitive advantage over Omnicare, the seller of pharmaceutical services. Omnicare also alleged that Defendants committed fraud, conspired to do so, and unjustly enriched themselves at Omnicare's expense by switching United to PacifiCare's more favorable contract. Defendants successfully moved to transfer the action to the Northern District of Illinois. (The contract United originally signed with Omnicare provided that Illinois courts were to have exclusive jurisdiction over disputes "arising under or in connection with" it.) The transfer was treated as

change of venue under 28 U.S.C. § 1404(a), *see Kerobo v. Sw. Clean Fuels Corp.*, 285 F.3d 531, 535 (6th Cir. 2002), and no party now contests its validity.

Once the case was relocated to the Northern District of Illinois, Defendants moved to dismiss Omnicare's antitrust claims pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court allowed the claims to go forward, concluding that Omnicare had "pleaded facts which plausibly suggest that the merger agreement constituted a contract, combination, or conspiracy between UnitedHealth and PacifiCare under section 1 of the Sherman Act." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 524 F. Supp. 2d 1031, 1039 (N.D. Ill. 2007). After extensive discovery, Defendants moved for summary judgment on all of Omnicare's claims. Omnicare crossmoved for partial summary judgment, arguing that Defendants' five affirmative defenses failed as a matter of law. The district court fully granted Defendants' motion and denied Omnicare's. Omnicare challenges these outcomes.

## II. Discussion

### A. Sherman Act Claims

### 1. Overview & Standard of Review

Omnicare alleges that United and PacifiCare coordinated their negotiations with Omnicare to avoid Omnicare's "Patient Protections" and depress the reimbursement rates they paid to Omnicare beneath the competitive level. Their alleged agreement had its genesis in

their pre-merger due diligence, during which Omnicare contends United learned competitively sensitive information about PacifiCare's Part D plans. United, armed with the knowledge that PacifiCare's anticipated Part D reimbursement rates were significantly lower than its own, allegedly agreed with PacifiCare that United would enter into a contract with Omnicare while PacifiCare played hardball, offering Omnicare only its "any willing provider" contract that had a low reimbursement rate and lacked Omnicare's "Patient Protections." Omnicare alleges that this plan unfolded precisely as described in the strategic options memo; PacifiCare acted as a "stalking horse," while United lay patiently in wait. When Omnicare inquired about PacifiCare's contracting plans some months later, United seized its opportunity and provided Omnicare with an intentionally misleading response that induced Omnicare to sign PacifiCare's "any willing provider" contract without negotiation. Shortly thereafter, the allegations continue, United completed its end of the agreement by concocting pretextual reasons to exit its contract with Omnicare and then joining PacifiCare's.

Omnicare contends that these actions constitute a buyers' cartel that is *per se* violative of the Sherman Act. It disputes the district court's conclusion that it failed to produce sufficient evidence to create a genuine issue of material fact as to the existence of an anticompetitive agreement between United and PacifiCare. Omnicare also challenges the district court's analytical methods and evaluation of its evidence. It claims that the district court evaluated its evidence in a piecemeal

rather than in the proper holistic fashion, *see Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 717 (7th Cir. 2006); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655-56 (7th Cir. 2002); ignored, discounted, and failed to draw favorable inferences from evidence it presented; usurped the role of the jury by inappropriately weighing evidence; and drew inferences in Defendants' favor.

We find no merit in Omnicare's claims that the district court bungled its analysis in its thorough opinion and order. Even on summary judgment, district courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record. *See Omosegbon v. Wells*, 335 F.3d 668, 677 (7th Cir. 2003). The district court's refusal to infer collusion from evidence put forth by Omnicare is in accordance with this general principle, and, importantly, does not amount to inappropriately drawing inferences in favor of Defendants. District courts are also not bound to discuss in detail every single factual allegation put forth at the summary judgment stage. *Fresenius USA, Inc. v. Baxter Int'l Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009) ("[T]here is no requirement that the district court's opinion discuss every single fact alleged."). Omnicare is correct that district courts presiding over summary judgment proceedings may not "weigh conflicting evidence," *High Fructose Corn Syrup*, 295 F.3d at 655, or make credibility determinations, *see Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007), both of which are the province of the jury. But the district court here did not make credibility

determinations, and it did not inappropriately weigh evidence. It instead scrutinized the evidence in what was substantively a holistic fashion, adhering closely to the governing law we outline below.

We review the district court's grant of summary judgment de novo. *See, e.g.*, *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150*, 433 F.3d 1024, 1030 (7th Cir. 2006). In doing so, we construe all facts and reasonable inferences in favor of the nonmoving party, *id.*, and take care not to weigh any conflicting evidence, *McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010); *High Fructose Corn Syrup*, 295 F.3d at 655 (describing the weighing of evidence as a "trap" to avoid when "deciding whether there is enough evidence of price fixing to create a jury issue"). But Omnicare cannot merely rest on its pleadings; it must affirmatively demonstrate, by producing evidence that is more than "merely colorable," that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## 2. Governing Law

Section 1 of the Sherman Act ("§ 1"), 15 U.S.C. § 1, is designed to prevent businesses from entering into collusive agreements, and section 4 of the Clayton Act, 15 U.S.C. § 15, provides a private cause of action for the enforcement of § 1. (Section 4 also provides treble damages and attorneys' fees to successful antitrust plaintiffs.) By its terms, § 1 prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce," 15 U.S.C. § 1, though courts have long restricted its

reach to agreements that unreasonably restrain trade, *see State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Agreements to fix prices unambiguously fall within the ambit of § 1. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).

Ordinarily, price-fixing agreements exist between sellers who collude to set their prices above or below prevailing market prices. But buyers may also violate § 1 by forming what is sometimes known as a "buyers' cartel." *See Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918, 927-28 (7th Cir. 1995) (conspiracy to depress soybean prices, intended to benefit soybean buyers, created cause of action in soybean sellers); *Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) ("[B]uyer cartels, the object of which is to force the prices that suppliers charge the members of the cartel below the competitive level, are illegal *per se*. Just as a sellers' cartel enables the charging of monopoly prices, a buyers' cartel enables the charging of monopsony prices; and monopoly and monopsony are symmetrical distortions of competition from an economic standpoint." (citations omitted)). That is what Omnicare alleges happened here.

To prevail under § 1 under any theory, plaintiffs generally must prove three things: (1) that defendants had a contract, combination, or conspiracy ("an agreement"); (2) that as a result, trade in the relevant market was unreasonably restrained; and (3) that they were injured. *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993); *cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986) ("To survive peti-

tioners' motion for summary judgment, respondents must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury."). Sometimes the second element is conclusively presumed once the first is proved; certain types of trade-restraining agreements, such as horizontal price-fixing ones like Omnicare alleges here, are considered *per se* unreasonable. *See, e.g., Tri-Gen*, 433 F.3d at 1032. Omnicare was unable to reap the benefit of the presumption, however, because the district court concluded that Omnicare's case faltered at the first stage. It granted Defendants' motion for summary judgment after finding that "Omnicare has failed to produce evidence of action by UnitedHealth and PacifiCare that is inconsistent with lawful conduct on the part of two competing entities engaged in legitimate merger discussions and planning." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 594 F. Supp. 2d 945, 974 (N.D. Ill. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (noting that summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

To show concerted action, antitrust plaintiffs must produce evidence that would allow a jury to infer that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). That is, the circumstances of the

case must reveal "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946). Two separate economic decisionmakers must be joined, "depriv[ing] the marketplace of independent centers of decisionmaking and therefore of a diversity of entrepreneurial interests." *Am. Needle, Inc. v. Nat'l Football League*, 130 S. Ct. 2201, 2212 (2010) (quotation and citation omitted); *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984) (noting that in an anticompetitive agreement, "two or more entities that previously pursued their own interests separately . . . combin[e] to act as one for their common benefit" in the restraint of trade); *cf. Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 930 (1st Cir. 1984) (Breyer, J.) ("Competitors cannot *agree*, for example, to insist that their contracts . . . contain arbitration clauses, even though each individual competitor can make up his own mind to insist upon such a term in any, or all, of his contracts."). Essentially, Omnicare must demonstrate that there is a genuine issue of material fact as to whether PacifiCare's decision to insist upon its "any willing provider" contract in its negotiations with Omnicare was made not by PacifiCare alone but rather by PacifiCare acting in concert with United while the two were horizontal competitors.

Omnicare's task—and ours—would be much easier if there were a smoking gun buried in the voluminous record. *See High Fructose Corn Syrup*, 295 F.3d at 654 ("[A]n admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs."); *see also*

*In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) ("[W]ith direct evidence the fact finder is not required to make inferences to establish facts." (quotation omitted)). But Omnicare's case, like most in this vein, is "constructed out of a tissue of [ambiguous] statements and other circumstantial evidence." *High Fructose Corn Syrup*, 295 F.3d at 662. It therefore must present evidence from which we can infer that United and PacifiCare had an anticompetitive agreement. *Id.* at 654. That is, Omnicare "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed" it. *Matsushita*, 475 U.S. at 588; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) ("[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."); *Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.*, 476 F.3d 442, 449 (7th Cir. 2007) ("When a plaintiff attempts to defeat summary judgment by highlighting circumstantial evidence of a conspiracy, some of the evidence must tend to exclude the possibility that the alleged conspirators acted independently rather than in concert."). This does not mean that Omnicare must overcome a heightened burden to defeat summary judgment, *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468 (1992); it simply means that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy," *Matsushita*, 475 U.S. at 588.

Omnicare has produced an extraordinary amount of evidence that in its view carries it over this threshold. But the mere production of evidence, even, as Defendants allege and we have no reason to doubt after poring through the dozen boxes constituting the appellate record in this case, millions of pages of documents and nearly sixty depositions, provides insufficient grounds for us to reverse a grant of summary judgment. Instead, we must determine whether summary judgment is appropriate using the two-part inquiry we set forth in *Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1171 (7th Cir. 1990); *see also Serfecz v. Jewel Food Stores*, 67 F.3d 591, 599 (7th Cir. 1995); *Res. Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 49 (7th Cir. 1992). Under that framework, we first assess whether Omnicare's evidence of agreement is ambiguous—that is, whether it is equally consistent with the Defendants' permissible independent interests as it is with improper activity. *Market Force*, 906 F.2d at 1171. If we conclude that the evidence could support the conclusion that Defendants were acting independently, we then look for any evidence that tends to exclude the possibility that Defendants were pursuing independent interests. *Id.* In other words, Omnicare must "show that the inference of conspiracy is reasonable in light of the competing inference of independent action." *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 660-61 (7th Cir. 1987); *see also Matsushita*, 475 U.S. at 597 n.21 ("[C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy.").

### 3. Evidence of Agreement

Omnicare's theory is that United and PacifiCare conspired to coordinate their negotiation strategies, thereby reducing the price they paid Omnicare for its institutional pharmacy services. Thus, to survive summary judgment on the first prong of the *Denny's Marina* test, Omnicare must show that it has produced evidence that, when considered collectively, would permit a reasonable jury to conclude that United and PacifiCare agreed to work together to fix prices. We discuss its proffered evidence below.

### a. The Strategic Options Memo & Accompanying E-mail

Because Omnicare claims that the strategic options memo (SOM) served as a "blueprint for the collusion," Appellant's Br. 41, we begin there. On September 1, 2005—about three months after United and PacifiCare's first alleged illicit information exchange, about two months after the formal merger agreement was signed, and about a month after United inked its contract with Omnicare—a PacifiCare executive sent an e-mail to a United executive. In that e-mail, which was by its terms "intended as an update" and referred back to a past memorandum that is not part of the record, the PacifiCare executive indicated that she had spoken with a different United executive and was "in agreement" that an unspecified "Part D readiness item . . . can and should be done." She also noted that she would schedule a teleconference so the two could "discuss

more sensitive items voice to voice," and attached "a draft of a think piece on the PBM"—the first draft of the SOM, which proposed, among other PBM strategies, using RxSolutions "as a stalking horse to obtain the best service and contracts."

Omnicare asserts that the district court erred in failing to "permit[ ] a jury to draw the inference that these discussions were collusive." Appellant's Br. 42. The district court had before it, however, the entirety of the e-mail and accompanying memo, as do we, and as would the jury. When viewed in context, the statements about "agreements" and "sensitive items" are decidedly ambiguous. The "agreement" about "Part D readiness" appears only to have resulted in the scheduling of a meeting between the due diligence teams to further discuss risk management. And the unspecified "sensitive items" could, as Defendants posit, just as easily be related to legitimate business matters such as personnel concerns as they could be to an illicit agreement. *See Market Force*, 906 F.2d at 1173 (considering defendants' legitimate business explanations for the alleged collusive conduct). At best, reasonable jurors could find that the statements contained in the e-mail are ambiguous evidence of vaguely directed joint conduct. *See id.* ("[I]t is well established that evidence of informal communications among several parties does not unambiguously support an inference of a conspiracy.").

The strategic options memo, despite its use of the loaded "stalking horse" phrase, is equally ambiguous evidence of the existence of a price-fixing, negotiation-

coordinating agreement between United and PacifiCare. Unquestionably, the SOM shows that United and PacifiCare were communicating about their future plans. It likewise shows that some of their discussions may have concerned RxSolutions and a potential plan to use it "to obtain the best service and contracts." Yet Omnicare has not demonstrated how these two features of the SOM, even when considered with all its other evidence, could lead a reasonable jury to infer a price-fixing conspiracy directed at Omnicare. Given the document's prospective language—all versions of the SOM invariably discuss options that "need to be considered," not options that are actively being (or have been) pursued—a reasonable jury would be hard-pressed to conclude that the SOM was drafted to guide PacifiCare's late-2005 dealings with Omnicare. Moreover, the record indicates that the SOM continued to be circulated, and even distributed at meetings, well after the Part D contracts were inked and the merger was finalized; the undisputed chronology of the SOM's distribution undercuts Omnicare's assertion that it was a "blueprint" for conspiracy, particularly where it was not circulated until well after the plan as Omnicare envisions it would have had to have been underway. *Cf. In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028, 1034 (7th Cir. 2002) (noting that drawing an inference of knowledge would be "shaky" where the alleged conspiratorial system was adopted before the alleged collusion began). The SOM's usefulness as a blueprint—and the reasonableness of any inference in that direction—is further called into question by its shifting placement of the "stalking horse" language.

### b.  Pre-Merger Information Exchange

Notwithstanding its contention that the SOM was the cornerstone of the conspiracy, Omnicare alleges that United and PacifiCare began coordinating their negotiation strategies when they improperly exchanged Part D pricing information during the period of due diligence preceding their merger.[2] Information exchange can help support an inference of a price-fixing agreement, *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.), but, like all circumstantial evidence

---

[2]  Omnicare asserts that the district court erred by not considering this contention as a stand-alone Sherman Act claim. *See* Appellant's Br. 47-50; *Todd v. Exxon Corp.*, 275 F.3d 191, 198-99 (2d Cir. 2001) (Sotomayor, J.) (discussing information exchange as an "analytically distinct" type of claim based on the Sherman Act). Yet Omnicare did not allege a distinct "information exchange" claim in its amended complaint, *see* First Suppl. & Am. Compl. ¶¶ 69-78; *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 758 n.15 (7th Cir. 2006); *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."), and, perhaps more importantly, it *did* allege an agreement to fix prices, not merely an exchange of information, *see Todd*, 275 F.3d at 199. In any event, the district court devoted roughly six pages of its opinion to "Premerger Communications and Information Exchange" and "Communications Subsequent to Execution of Merger Agreement." *See Omnicare,* 594 F. Supp. 2d at 968-74. We have no doubt that the court considered this facet of Omnicare's claim, even if it failed to do so as explicitly as Omnicare would have liked.

of conspiracy, it is not on its own demonstrative of anticompetitive behavior, even when pricing data is what is exchanged, *see Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) (citing *Baby Food*, 166 F.3d at 118; *City of Long Beach v. Standard Oil Co.*, 872 F.2d 1401, 1406 (9th Cir. 1989) (noting that competitors may exchange price information for legitimate business reasons); *cf. Todd*, 275 F.3d at 199 (applying the rule of reason to analyze Todd's information exchange claim). Omnicare argues that the exchanges here amount to something sinister, particularly because United may have breached its confidentiality agreements. *See Omnicare*, 594 F. Supp. 2d at 969-71. In support of its contentions, Omnicare points to several specific information exchanges: "Part D Questions" that PacifiCare answered at United's request in June 2005; a "Due Diligence Summary," including a table of Part D bid comparisons, prepared sometime between June 28 and July 2, 2005; a Part D risk assessment created by a United-affiliated actuary after he met with four PacifiCare representatives on July 2, 2005; some average pricing information about United's Part D plans that the actuary delivered, in a sealed envelope, to a PacifiCare representative not present at the meeting; and deposition testimony regarding a conversation about the mutual difficulties United and PacifiCare were experiencing in their negotiations with Omnicare.[3]

---

[3] We note that many of these documents are under seal. We therefore discuss them using general, descriptive terms where

(continued...)

We agree with the district court that the nature of Omnicare's information-exchange contentions requires us to walk a fine line:

> On the one hand, courts should not allow plaintiffs to pursue Sherman Act claims merely because conversations concerning business took place between competitors during merger talks; such a standard could chill business activity by companies that would merge but for a concern over potential litigation. On the other hand, the mere possibility of a merger cannot permit business rivals to freely exchange competitively sensitive information. This standard could lead to "sham" merger negotiations, or at least allow for periods of cartel behavior when, as here, there is a substantial period of time between the signing of the merger agreement and the closing of the deal.

*Omnicare*, 594 F. Supp. 2d at 968. Looking at the pricing information that was exchanged, however, we cannot see how a reasonable jury could conclude that it is more consistent with action on the conspiratorial side of the line than with action on the innocuous due diligence side. PacifiCare answered the "Part D Questions" in general terms, and sometimes disclosed less information than was requested because that was "what

---

[3] (...continued)
possible, excerpting only information that does not appear to be particularly sensitive. We do the same as the need arises elsewhere.

the attorneys permitted." The Due Diligence Summary—which discusses information gathered in the final month preceding the merger agreement—provides more detailed information, but it too is restricted to "sample regions," "high level review," and "estimates." Even the Summary's comparison of PacifiCare's and United's pricing and benefits is restricted to general terms—"consistent," "higher," "roughly," and the like.

The purpose of the meeting the actuary attended and summarized was to determine the impact of PacifiCare's Part D offerings on United's valuation of the company for merger purposes. Not only is accurate valuation a critical component of the merger process, but, like the other pricing information, the valuation information was shared among a small number of executives on the eve of the merger agreement. Moreover, there is no evidence that the actuary relayed the information gleaned from the meeting directly to any United executives, let alone those who were not cleared to receive it. The record instead shows that he sent the report first to PacifiCare's outside counsel, who reviewed it and excised what he believed to be "competitively sensitive" details before sending it along to United's outside counsel, who in turn reviewed it before sending it to a handful of United executives. Even more notably, the individual Omnicare identifies as the overseer of United's Part D-related pharmaceutical contracting was not included among the report's recipients.

The report itself recognizes that its ability to assess risk is limited "without knowing the specific regions

or [PacifiCare's] estimate of results by region" and delivers its conclusions in general terms. For instance, it merely notes that PacifiCare "appears to have appropriately priced the benefit differences" without divulging the nature of the benefits or their prices, and similarly opines that PacifiCare has in some instances "taken a conservative approach" without providing the specific bases for that conclusion. E-mails circulated contemporaneously among the United executives who received the report place a further damper on a jury's ability to infer long-planned concerted action between United and PacifiCare. In particular, one of United's Part D financial executives noted that one factor contributing to his increasing comfort with PacifiCare's Part D plans was that "in year 2, we can move them to our contracts"—the complete opposite of the collusive outcome toward which United and PacifiCare were allegedly working.

The conversation between a United executive and a PacifiCare executive did not involve price but rather concerned the parties' mutual difficulties reaching timely contracts with Omnicare. (Recall that United did not sign its contract with Omnicare until late July 2005, and pharmacy network proposals were due to CMS on August 1.) The extent of the evidence of the conversation is six lines of a United executive's deposition, wherein he stated, "I do recall a conversation with Jaqueline Kosecoff in the context of difficulties that we were having reaching a timely contract with— with Omnicare, and I believe that she told me that [PacifiCare] was also having difficulties reaching an

agreement with the contract." Phanstiel Dep. 93:22-94:2, Feb. 5, 2008. No reasonable jury could conclude that the conversation—which is mentioned only once in the record—gives rise to an inference of illicit agreement. The mere mention of contracting difficulty in the course of a merger and development of new Part D plans does not indicate the existence of a conspiracy to fix prices, nor does it indicate coordination of any pricing, contracting, or negotiation strategy whatsoever. Moreover, it would have had to have taken place sometime before United signed its contract with Omnicare, which was at least a month before the SOM outlining the alleged plan of attack was drafted.

Viewed separately and collectively, Omnicare's evidence of information exchange would not enable reasonable jurors to infer that United and PacifiCare inappropriately shared information damaging to competition in and of itself (Omnicare's alleged standalone claim), nor that the information exchanged facilitated the development or advancement of a coordinated negotiating and pricing strategy. It similarly does not tend to exclude the possibility that United and PacifiCare were acting to advance their own legitimate interests. It may illuminate other evidence, however, so we keep it in mind as we work toward completing the evidentiary picture.

### c. Merger Agreement & Carve-Out

United and PacifiCare executed their formal merger agreement on July 6, 2005. Section 5.01 of the agreement

prohibited PacifiCare from incurring any contract liability of $3 million or more before the consummation of the merger without United's written approval. Section 5.01 would thus on its face effectively prevent PacifiCare from entering into any Part D agreements without United's review and approval. But section 5.01 also created an exception to its blanket prohibition: a "company disclosure letter," referred to by the parties as the "carve-out." The carve-out provided that PacifiCare (and its subsidiaries, including PBM RxSolutions) "may enter into or amend any Contracts relating to their Part D standalone business that are variable cost or based on sales production" without permission from United. Omnicare contends that the carve-out was a consequence of the illicit information exchange that occurred during the Defendants' due diligence. *See* Part II.A.3.b, *supra*. It also presents an expert opinion that the proper inference to be drawn from the existence of the carve-out is that "United had become comfortable with PacifiCare's Part D contracting strategy based upon the confidential information it had obtained."

Omnicare directs our attention to testimony from a United Rule 30(b)(6) witness, who stated that United agreed to the carve-out because it had reviewed PacifiCare's pricing information. That testimony could support the reasonable inference that PacifiCare and United were cooperating illicitly. But it must be considered not only in light of the information exchanged, which was not on its face improper, but also in light of the remainder of the witness's testimony, wherein he stated, in the very same sentence, that United re-

viewed the information only at a "very high level" of generality. He further explained that United and Pacifi-Care recognized the impropriety of sharing "specific Part D information with each other . . . between signing and close." If jurors were to find that witness credible, his uncontested statements about the scope of United's review, as well as the evidence of the information United actually received, would limit their ability to draw an inference of collusion from the mere existence of the carve-out.

The inference advocated by Omnicares expert is a reasonable one jurors could make. It is supported both by the context of the merger regardless of the level of detail of the information United received, it received it in confidence during due diligence and by the testimony of the Rule 30(b)(6) witness. The problem for Omnicare is that jurors would have to draw additional inferences from the expert's suggested inference to conclude that the carve-out was demonstrative of an agreement related not to the merger but rather to Part D negotiating and contracting strategy. Such inferences might be reasonable; after all, the carve-out specifically addresses Part D. There is countervailing evidence, namely that the carve-out by its terms excuses PacifiCare from involving United in its Part D plans, but weighing evidence is a task for the jury, not for this court.

We are tasked, however, with considering Defendants' assertions that the carve-out was as compatible with their legitimate business activity as it is with Omnicare's theory. *Market Force*, 906 F.2d at 1171. Here, Defendants

point to the Rule 30(b)(6) witness's testimony, which they assert demonstrates United's recognition that "it was clearly inappropriate to share specific Part D information with each other between signing and close." This recognition, they contend, leads to an inference that the carve-out operated to ensure the independence of the parties' Part D dealings. This inference is grounded in the record; reasonable jurors could find it as persuasive as Omnicare's contentions that the carve-out proved just the opposite. We are therefore confronted with an ambiguity that can be resolved in Omnicare's favor only if it produces some evidence that tends to exclude the possibility that United and PacifiCare were pursuing independent interests. *See id.* at 1173. Because we consider Omnicare's evidence holistically, the absence of a specific piece of exclusionary evidence at this juncture does not necessarily undermine Omnicare's case.

### d. PacifiCare's Negotiating Tactics

Negotiations between Omnicare and RxSolutions (on behalf of PacifiCare) started off well enough in spring 2005, with a cordial exchange of e-mails and telephone calls that eventually resulted in an exchange of form contracts. A few friendly but firm e-mails followed, in which each expressed a preference for its own form contract. RxSolutions explained that PacifiCare expected to enter into agreements with nearly 2000 pharmacies and therefore could not take the time to modify Omnicare's proposed contract to its liking. Omnicare acknowledged PacifiCare's concerns but nonetheless urged

PacifiCare to look over its contract and inform Omnicare of its most salient objections to provide a starting point for negotiations. The record contains a document indicating that RxSolutions and PacifiCare may have made at least some effort to comply with Omnicare's request, but Omnicare claims that it first received this document during discovery, and we draw the inference in Omnicare's favor. *E.g., Miles*, 476 F.3d at 448. At any rate, by July 6, the day of PacifiCare's merger with United, negotiations between Omnicare and RxSolutions had deteriorated significantly. Omnicare's negotiations log indicates that the parties were "[w]ay off on price" and had a phone call that did not go well. Roughly one week later, on July 14, RxSolutions informed Omnicare that PacifiCare had decided to walk away from the table. RxSolutions cited Omnicare's proposed reimbursement rate as the basis for PacifiCare's exit from negotiations. Omnicare did not propose a lower rate, but it assured RxSolutions that it would "stand ready to negotiate" if PacifiCare chose to do so.

PacifiCare instead submitted its Part D bid to CMS without Omnicare in its network. CMS rejected the bid, but gave PacifiCare a three-day window in which to shore up its institutional pharmacy network. To do so, PacifiCare reopened its negotiations with Managed Health Care Associates, a large institutional pharmacy that competes with Omnicare, and struck a deal to get Managed Health Care Associates in its network. PacifiCare promptly resubmitted its bid and received CMS approval in September 2005.

On November 8, 2005, CMS issued a statement regarding its "convenient access" standard. The statement encouraged Part D plan sponsors to contract with long-term-care pharmacies to ensure that their plan members residing in institutional facilities could easily access their necessary medications. The statement also informed pharmacies that it was "imperative" for them to "not withhold contracts" to similarly foster access for the most fragile Part D participants, and it emphasized at least twice that the contracting process should be "ongoing" and could continue "before and after the benefit begins on January 1, 2006." Shortly after this statement was issued, and two weeks after it received an e-mail from United regarding PacifiCare's future Part D plans, *see infra* Part II.A.3.e, Omnicare contacted RxSolutions to reopen negotiations with PacifiCare. PacifiCare responded by offering Omnicare the same "any willing provider" contract Omnicare had previously rejected. This time, however, Omnicare did not ask PacifiCare to look at its own form contract or to consider an alternative reimbursement structure or other contractual provisions. It instead informed PacifiCare on December 5 that it was "prepared to sign" PacifiCare's "any willing provider" contract and did so the next day.

Omnicare contends that this sequence of events only makes sense if PacifiCare was coordinating its negotiations strategy with United. It points to PacifiCare's "abrupt" termination of negotiations in July and its lack of a contingency plan to provide medication to its Part D enrollees residing in Omnicare-serviced facilities as

evidence of PacifiCare's irrational behavior. It also points to expert testimony that PacifiCare should have been more risk averse in the face of an impending acquisition that would net it $1.2 billion in market capitalization, and in light of the possibility that CMS could revoke its Part D contract if it could not provide medication to its enrollees. Omnicare also claims that PacifiCare was the only Part D plan that steadfastly refused to negotiate with it, particularly after CMS assigned plans their Medicaid-eligible participants.

Validating Omnicare's contentions would require reasonable jurors to draw inferences beyond those possible even within the pro-nonmovant confines of summary judgment. First, Omnicare's characterization of PacifiCare's withdrawal from negotiations as "abrupt" is a stretch in light of the evidence detailing the parties' negotiations process. Omnicare's own log of its negotiations with PacifiCare reveals that fissures began emerging in the parties' relationship shortly after they exchanged form contracts. The log notes that a phone conversation the week prior to PacifiCare's withdrawal "did not go well" because the parties were "[w]ay off on price." It also reveals that Omnicare was aware that PacifiCare was "talking to [Omnicare's] competitors" from the time of the parties' very first conference call in early April 2005. Perhaps PacifiCare's decision to end negotiations nonetheless came as a surprise to Omnicare, but the record does not support the inference that it was irrational and therefore entered at the behest of United.

Second, Omnicare relies on PacifiCare's failure to craft a "contingency plan" as evidence that United was

acting covertly as its safety net. Yet the November statement from CMS made clear that the contracting phase of the Part D launch could, and likely should, continue past the formal launch date of January 1, 2006. No evidence supports the conclusion that CMS required Part D plans to develop contingency plans if they were unable to enter into satisfactory contracts with every pharmacy with which they engaged in negotiations.

Omnicare did introduce evidence showing that many long-term care facilities enter into exclusive contracts with institutional pharmacies, and that it is costly for the facilities to switch or add providers. It argues that PacifiCare must have known, given Omnicare's substantial market share, that some of its randomly assigned Part D participants would reside in Omnicare-contracted facilities; it was therefore irrational for PacifiCare not to contract with Omnicare unless PacifiCare was acting in concert with United. This argument has some persuasive force, though it ignores record evidence from CMS explaining that the Part D convenient access standards were designed to "promote competition" and "give each facility access to a broader range of potential [long-term care] pharmacies than is the case today." In light of the statements from CMS, both about increased competition and continued contracting, and against the uncertain landscape of a completely new program, PacifiCare's behavior would not necessarily be contrary to its economic interest and thus exclusive of independent conduct. Indeed, PacifiCare succeeded in securing CMS approval of its Part D pharmacy network without Omnicare, and the record shows that it was not

the only Part D plan sponsor that was able to get approval under such conditions.

To rebut this evidence tending to show that PacifiCare acted rationally and independently, *see Market Force*, 906 F.2d at 1173, Omnicare asserts that PacifiCare's behavior was particularly suspect in two crucial respects. First, Omnicare contends that PacifiCare was the only large Part D plan sponsor that did not take the initiative to reopen negotiations with Omnicare after receiving its list of randomly assigned Medicaid-eligible enrollees. Second, it argues that because PacifiCare was in the midst of being acquired, it should have been particularly risk-averse so as to ensure the consummation of the merger.

The first contention is not supported by the record. Omnicare points to a single e-mail from Humana, a large insurer and Part D plan sponsor, in which Humana expressed its post-CMS-approval willingness to reach an agreement with Omnicare. We must infer that this e-mail, which is presented in isolation, was a sua sponte undertaking on the part of Humana. But Omnicare produces no other evidence showing that other insurers in fact took the first steps toward post-approval negotiations. Perhaps Humana's overtures, and not PacifiCare's lack thereof, were the aberration; we cannot tell from the record, and we therefore cannot conclude that the Humana e-mail tends to exclude the possibility that PacifiCare was acting in its own independent interest.

Support for the second contention is somewhat more salient. Omnicare has submitted an expert report from

Professor John Coates in which he opines that acquisition targets generally behave conservatively. In his view, PacifiCare would not have pursued a "risky strategy of offering Omnicare nothing but an 'any willing provider' contract" absent an agreement on negotiation strategy with United. Appellant's Br. 35. Assuming that Coates' report is admissible, *cf. Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993), it supports Omnicare's theory of the case. Yet its ultimate relevance hinges on the determination that what PacifiCare did was, in fact, risky. Omnicare has produced evidence showing that Part D was critical to the United-PacifiCare merger and that PacifiCare stood to gain over $1 billion if the merger panned out. This evidence supports the inference that PacifiCare's behavior, even if rational, was not without its share of risk. Defendants, on the other hand, suggest that PacifiCare executives were simply "anxious to impress their new owners with their negotiating skills" and bargained hard to achieve that end. Appellees' Br. 31. In light of these competing inferences, we ask whether there is any evidence that tends to exclude the possibility that PacifiCare was acting in accordance with its independent aims. *Market Force*, 906 F.2d at 1171.

Here, Omnicare comes up short, at least with respect to the issue of negotiation in isolation. Omnicare's theory is that PacifiCare acted the way it did because it knew that if its strategy failed, it could join United's contract with Omnicare or at the very least that United would not abandon the merger given its complicity. But the contract governing United's relationship with

Omnicare provided that no modifications could be made to the list of contracted plans without Omnicare's written consent, which was to be awarded in Omnicare's sole discretion. Regardless of any conspiracy, Omnicare had full power over which insurers could become parties to the United contract. This renders the existence of a fall-back plan between United and PacifiCare essentially useless; the parties "'must make a substantial investment with no assurance that it will pay off.'" *Matsushita*, 475 U.S. at 588 (quoting Frank H. Easterbrook, *Predatory Strategies and Counterstrategies*, 48 U. Chi. L. Rev. 263, 268 (1981)). We thus find it difficult to conclude that inferring anticompetitive agreement from PacifiCare's negotiation tactics, though perhaps reasonable, is *as* reasonable as inferring it acted independently. *See Matsushita*, 475 U.S. at 588. Again, however, we will reevaluate the import of PacifiCare's hard-line bargaining as part of our holistic assessment of the evidence. *See infra* Part II.A.3.h.

### e. The October E-mails

In mid-October 2005, Omnicare's Tim Bien became concerned that PacifiCare Part D enrollees who resided in Omnicare-serviced institutions would be unable to get their medications once Part D went live because PacifiCare had no agreement in place with Omnicare. To determine if United intended to add PacifiCare enrollees to its pre-existing contract with Omnicare, and thus put his concerns to rest, Bien sent an informal e-mail to United's Craig Stephens on October 17. That

e-mail read, "Craig, Is there a sense of when United will close the acquisition of PacifiCare? When the deal closes, will PacifiCare be contracted with Omnicare as a result of the acquisition? Thanks for your help on this. Tim Bien." After a week passed with no response from Stephens, Bien sent a follow-up e-mail in which he reproduced the first e-mail and asked, "Can you give me anything on this?" Before responding to Bien, Stephens consulted with two of his superiors, both of whom had learned some information about PacifiCare during due diligence. He also forwarded the e-mail to United's in-house counsel, adding, "Interesting—should we assume Pacificare has not agreed with Omnicare?" In-house counsel's response is not included in the record, though in-house counsel recalled reviewing a draft of Stephens's response e-mail, which was sent to Bien on October 31. In that e-mail, Stephens stated, "PacifiCare's Part D offering for 2008 is a unique contract with CMS. If and when the deal closes, PacifiCare will follow their own Part D product strategy throughout the 2006 calendar year."

Bien forwarded this reply to Omnicare's CEO, adding, "PacifiCare will not be included with the United Part D offering." The CEO later stated at his deposition that he took the e-mail to mean that PacifiCare "would be an independent, freestanding, unique contract in 2006, having nothing to do with United, and that on that basis it would be all right for us to cover those few percent of our patients in the PacifiCare plans through an ['any willing provider'] agreement since they wouldn't give us anything else." One week after Stephens sent his

reply e-mail, CMS issued a statement encouraging Part D plans and pharmacies to continue their negotiations. The week after that, Omnicare contacted PacifiCare to reopen negotiations and received PacifiCare's "any willing provider" contract in return.

Omnicare identifies Stephens's October 31 e-mail as the primary catalyst for its future dealings with Pacifi-Care. It contends that because the e-mail was drafted after consultation with individuals who had access to PacifiCare's pricing data, and was sent "with knowledge that Omnicare was deciding whether to seek a separate contract with PacifiCare," Appellant's Br. 39, it supports an inference "that United wanted to deceive Omnicare into entering an 'any willing provider' contract with PacifiCare," *id.* at 40. Indeed, Omnicare asserts that Bien's inquiry gave United the opportunity to set its collusive plan with PacifiCare in motion.

Omnicare's suggested inferences may be a bit of a stretch for reasonable jurors. Though United was able to offer Omnicare an answer on PacifiCare's behalf, there is no evidence that the answer was based on any improper information. *See supra* Part II.A.3.b (discussing Omnicare's evidence of pre-merger information exchange). Similarly, the record contains no evidence that United consulted with PacifiCare about the response, which would be expected if the two were working together to elicit action from Omnicare. There is also no evidence indicating whether or how United knew Omnicare's motivation for sending the e-mail; it is not clear how United would know what Omnicare's negotia-

tions plans were, or could predict the extent to which a two-line e-mail might influence the sophisticated company's behavior. Even if we assume, generously, that Omnicare reopened negotiations with PacifiCare on the basis of this e-mail, it's not clear how United could have reasonably expected, or even intended, the e-mail to dictate Omnicare's subsequent decision to contract with PacifiCare without negotiation.

The e-mails therefore do little to demonstrate that United and PacifiCare had any sort of agreement. They are, however, consistent with independent action. Omnicare unilaterally initiated the communications that precipitated the e-mail; PacifiCare had not been acting like a "stalking horse," seeking out a contract with Omnicare. United responded to Omnicare's e-mails without consulting alleged partner PacifiCare. Moreover, it responded to the question Omnicare asked, that is, whether United planned to add PacifiCare onto its contract. Though United did not respond immediately, sending a response after consulting with a legal department is well within the norms of independent behavior. And United's response was truthful: PacifiCare did have its own contract with CMS, and the carve-out to the merger agreement gave it free rein to conduct its Part D negotiations independently. Nothing about United's response to Omnicare's e-mails tends to exclude independent action.

#### f.  The Contract Rate

The penultimate step in the alleged conspiracy between United and PacifiCare was Omnicare's signing of

PacifiCare "any willing provider" contract, which contained a reimbursement rate below that which Omnicare received in connection with most other Part D plans. Omnicare contends that the rate is so far below that which would be expected in a competitive market that an inference that United and PacifiCare colluded to generate it is reasonable on the basis of the rate alone. In support of its contention, Omnicare points to a report from its economics expert, Professor Daniel Rubinfeld, which shows that the rate in the PacifiCare contract was significantly lower than both the rates Omnicare negotiated with other Part D plan sponsors and the ones that PacifiCare negotiated with other pharmacies. Omnicare also asserts that PacifiCare was the only Part D plan to "demand from the largest institutional pharmacy a sub-competitive rate on a non-negotiable basis, a fact that tends to exclude independent action." Appellant's Br. 44. Omnicare also raises a host of challenges to the district court's handling of its contention about the rate and the evidence it put forth to support it; it claims that the district court usurped the role of the jury; ignored evidence, including Professor Rubinfeld's regression analysis; and overstated the significance of PacifiCare's CMS approval.

We proceed directly to Omnicare's contention that the district court substantively erred in its assessment of the contract rate. (If the district court did misstep in its treatment of the evidence, which we do not believe it did, *see supra* Part II.A.1, our de novo review should go far toward rectifying any errors.) The district court concluded that the contract rate was largely the result

of Omnicare's failure to engage PacifiCare in negotiations. Indeed, Omnicare conceded at oral argument that the alleged "stalking horse" strategy would have imploded if it had simply declined to sign PacifiCare's "any willing provider" contract. "If the contract really made no economic sense, as Omnicare now contends, one would not have expected Omnicare to enter into that contract so readily." *Omnicare*, 594 F. Supp. 2d at 967. But that is what Omnicare did, and we cannot ignore the impact that a lack of negotiation had on the agreed-upon rate. Professor Rubinfeld, whose regression analysis Omnicare characterizes as supportive of its claim that the rate should have been higher, specifically noted that his analysis "assumed that the bargaining process between PacifiCare and Omnicare is similar to the bargaining process between other [insurers] and Omnicare." Omnicare has not produced any evidence that any of its other contracts, providing for rates within the fair market norm, were signed without negotiation. To the contrary, it notes that other large Part D plan sponsors with whom it signed contracts late in the game "*agreed to*" rates in line with what Omnicare generally expected, indicating that at least some back-and-forth occurred. Appellant's Br. 45 (emphasis added).

Omnicare has produced some evidence from which reasonable jurors could infer that PacifiCare rebuffed its good-faith negotiating efforts, including PacifiCare's assertion that its "any willing provider" contract was its "best offer," and deposition testimony from a PacifiCare employee stating that he would not have recommended that PacifiCare go back to Omnicare if it refused

the "any willing provider" contract. Yet, as discussed above, PacifiCare's hard-line negotiating and attempts to get the lowest rates possible were not inconsistent with its independent economic interest and therefore do not give rise to a material issue regarding the existence of a conspiracy. That is particularly true given PacifiCare's approval by CMS. Omnicare attempts to minimize the significance of this fact (and indeed claims that the district court overemphasized it), but Omnicare characterizes the January 1, 2006, Part D launch date as a hard-and-fast negotiating deadline after which approval would be immediately revoked if problems arose. This characterization is belied by statements from CMS that Omnicare itself placed in the record.

Omnicare also attempts to de-emphasize the existence of other contracts it entered at similarly unfavorable rates. Those contracts, made with a few small Part D plans, indicate that the rate contained in PacifiCare's contract is not *per se* anticompetitive on its face. Omnicare asserts that its "transactions costs in negotiating with either of these two [insurers] would outweigh any benefit gained through negotiating a competitive rate." Appellant's Br. 47. The testimony from Omnciare's CEO indicates that it may have made a similar calculus with PacifiCare, despite having full knowledge of PacifiCare's impending merger with United and presumable awareness that the "any willing provider" contract gave PacifiCare the ability to add parties at will. (Omnicare conceded as much at oral argument, asserting, "It was a rational economic decision to sign the PacifiCare contract on PacifiCare's terms" to "pick up additional reve-

nue" after it had contracted with "everyone else.") The mere fact that Omnicare opted not to negotiate the rate provision in PacifiCare's proffered contract does not render it "non-negotiable" or "sub-competitive." Nor does it support an inference of collusion.

### g. United's Behavior Toward Omnicare

United executed its WHI-negotiated contract with Omnicare in late July 2005. According to Omnicare, United began trying to exit the contract after (inappropriately) learning in due diligence that PacifiCare planned to get Omnicare to sign its "any willing provider" contract. To that end, United concocted some pretextual legal concerns about Omnicare's "Patient Protections," which may have actually been "business concerns," and withheld those concerns from Omnicare until it contracted with PacifiCare in December 2005. United also instructed WHI, its PBM and negotiator of the contract, to remain tight-lipped about its contractual concerns. Mere days after the PacifiCare-Omnicare contract was in place, United voiced its concerns to Omnicare. It then abandoned its contract in favor of PacifiCare's two months later. Omnicare points to the "suspicious timing" of all these events as indicative of collusion.

For its part, United contends that its concerns about the "Patient Protections"—namely, that they were violative of Medicare Part D regulations—were genuine, arose earlier, and were shared by other Part D plan sponsors. (Omnicare concedes the latter point.) It also maintains that it did not know about PacifiCare's contract

when it brought its concerns to Omnicare's attention, and the record shows that it attempted to allay its concerns and preserve its relationship with Omnicare by trying to renegotiate its own contract. United offers no explanation for the timing of its initial discussion with Omnicare, or for instructing WHI not to contact Omnicare.

Both parties omit some important details from their discussion of United's behavior. Fortunately, the well-developed record fills in many of the gaps. According to documents in the record, United's inside counsel was exploring the possibility of having WHI renegotiate its contract with Omnicare in early September 2005. United also enlisted outside counsel to review the contract at that time. Outside counsel provided United with its opinion that the Patient Protections were suspect two months later, on November 9, 2005. (Counsel at WHI also independently concluded that there were potential legal issues with the Patient Protections, at least as they related to United.) United was unable to personally approach Omnicare, however, until later in November; its contract with WHI forbade it from conducting its own negotiations without permission from WHI, which was not orally granted until November 22, 2005. In early December, United specifically instructed WHI not to "discuss the details with Omnicare until further notice;" it wanted "NO communication to Omnicare that we will be removing ourselves from the WHI contract." United also told WHI, however, that it "believe[d] Omnicare is looking for common ground to implement" and had decided to "not be aggressive on the call unless they shoot first."

United and Omnicare reopened negotiations with a phone conference on December 8, 2005. The record indicates that the call was scheduled in advance, as e-mails sent on December 7 mention it, but it is unclear when the date was set. (If the call was planned prior to December 6, it would significantly undermine any inferences that could be drawn from the "suspicious timing" of United's behavior, because Omnicare would have known United had contractual concerns prior to signing PacifiCare's contract on December 6.) Notes from the call indicate that Omnicare was amenable to renegotiating directly with United, though the record shows that WHI proposed a revised agreement in late December, in which the reimbursement rates paid to Omnicare remained at their original levels but from which the Patient Protections were excised. Notes from the December 8 call also show that Omnicare mentioned the possibility of adding PacifiCare to any renegotiated United contract.

When Omnicare's narrative is supplemented with record evidence omitted from its original timeline, the inference of "suspicious timing" becomes more difficult for a reasonable jury to make. United was unable to raise its concerns with Omnicare prior to November 22, 2005. And it raised its concerns before the merger had been fully approved by the Department of Justice; if talks with Omnicare went poorly and the merger fell through, United would not have had any PacifiCare contract option available to fall back on. There is no evidence showing that either United or PacifiCare had any influence over Omnicare's decision whether—or

when—to sign PacifiCare's "any willing provider" contract. The December 8 conference call was scheduled at least a day in advance, presumably at a mutually agreeable time, and it resulted in efforts by United to revise the contract. Only United's instructions to WHI remain arguably "suspicious."

United's behavior toward Omnicare cannot on the whole be construed as indicative of its involvement in an anticompetitive agreement with PacifiCare. United's stated concerns about the "Patient Protections" were sufficiently prevalent that CMS later addressed them in an "FAQ" format. Perhaps most tellingly, over the course of a few months, United, occasionally with the aid of WHI, worked toward a new contract with Omnicare, though Omnicare rejected the revisions. If United planned all along to abandon its contract to join PacifiCare's, it would be irrational for it to invest significant time and resources into negotiating a new, less favorable contract from which it only intended to extricate itself. Outside of United's strongly worded instructions to WHI, which themselves tell us nothing about United's consortium with PacifiCare, there is little about United's behavior that excludes the possibility that it was acting independently.

### h. The Big Picture

The bulk of Omnicare's evidence, when viewed alone, does not satisfy the *Market Force* test. However, we must look at it all together before closing the door on Omnicare's Sherman Act claim. *See High Fructose Corn*

*Syrup*, 295 F.3d at 655; *supra* Part II.A.1. To recap, Omnicare's theory is that United and PacifiCare colluded, before and during their 2005 merger, to depress the prices they would pay for Omnicare's pharmaceutical services. The alleged conspiracy achieved its ultimate goal in February 2006, when United switched its Part D enrollees serviced by Omnicare to PacifiCare's much more favorable contract. Omnicare contends that the design of the "evolving scheme," Appellant's Br. 23, was set forth in the strategic options memo and was furthered by continual exchanges of sensitive pricing information. These exchanges of information formed the backbone of the collusion. They resulted in a carve-out to the United-PacifiCare merger agreement, permitted both PacifiCare and United to behave irrationally in their dealings with Omnicare, and even underlay United's inducement of Omnicare to sign PacifiCare's "any willing provider" contract, which it then joined. Omnicare claims that the rate at which it is now reimbursed by both United and PacifiCare is far below what it should be.

Omnicare's richly detailed narrative is complex and compelling. But Omnicare cannot get to trial based on the elegance of its theory alone. To survive summary judgment, it "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed" it. *Matsushita*, 475 U.S. at 588. Not only that, its "offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently." *Bell Atl. Corp.*, 550 U.S. at 554. When consid-

ered alongside the competing inference of independent action, the inference of conspiracy is the less reasonable of the two. Likewise, the ample evidence offered by Omnicare does not on the whole tend to negate the reasonable inference of independent action.

Much of Omnicare's theory is predicated on an impermissible flow of competitively sensitive information between United and PacifiCare. But Omnicare's evidence purporting to show this illicit exchange demonstrates only a circulation of generalized and averaged high-level pricing data, policed by outside counsel, that is more consistent with independent than collusive action. Without evidentiary support for a conspiratorial information exchange, Omnicare's claims detailing how United and PacifiCare put this information to use become less plausible as well. For instance, if executives did not possess inappropriate information, the strategic options memo loses some of its inculpatory value, as does the merger agreement carve-out.

The conspiracy theory is further impugned when all the actions composing the alleged conspiracy are mapped sequentially, and superimposed upon a chronological timeline of Part D launch events and other events omitted from the collusion narrative. The information exchange allegedly began in spring 2005, but the evidence to which Omnicare points (the Part D questions, the Due Diligence Summary, etc.) did not come into existence until the last few weeks of the months-long due diligence process. Candid e-mails circulated among United executives immediately before the merger indicate that

the long-range plan at that time was to let PacifiCare hash out its own contracts while working to move it to United's contract for 2007; they were consistent with Stephens's representations in the October e-mail. The strategic options memo, which Omnicare presents as a "blueprint," was not drafted until the alleged collusion was well underway, after United already had a contract with Omnicare, and before Omnicare took the initiative to reopen negotiations with PacifiCare. It is difficult to reconcile the theory of an affirmative, ongoing conspiracy aimed at using RxSolutions as a stalking horse with evidence showing that the very target of the conspiracy, Omnicare, was the party that made overtures toward RxSolutions. Even if PacifiCare and United were privy to one another's information, there is no evidence or even allegation that they were steering Omnicare's behavior.

Other critical links in the conspiracy narrative lose much of their force when Omnicare's independence is factored in. First, Stephens's e-mail, which in Omnicare's view set the stage for the final acts of the conspiracy, was precipitated by e-mails sent by Omnicare. Second, United's "suspicious" withholding of its concerns is only suspicious in light of Omnicare's execution of PacifiCare's "any willing provider" contract mere days earlier. And even then, when the fact that the merger had not yet been approved is added to the narrative, United's timing appears even more likely to have been independently motivated, an inference bolstered further by its subsequent attempts to renegotiate its contract with Omnicare. (The timing of its disclosure

was also affected by its outside counsel and contract with WHI, two facts Omnicare omitted from its allegations.) Third, Omnicare was the party that refused to sign United's revised version of the contract, with knowledge that PacifiCare's contract did not have any sort of restrictions on who could join it. Of course, this is not to say that Omnicare made its proverbial bed and is barred from recovery. (Though we note that "[t]he antitrust laws are not panaceas for all business affronts which seem to fit nowhere else." *ECOS Elecs. Corp. v. Underwriters Labs.*, 743 F.2d 498, 501 (7th Cir. 1984).) Yet many key events in the alleged conspiracy could not have happened without the specific inputs provided by Omnicare, and that makes the competing inference of independent action on the parts of Defendants more difficult for Omnicare to overcome.

After considering the totality of Omnicare's evidence, both separately and holistically, we cannot conclude that it would permit a reasonable jury to dismiss the inference that United and PacifiCare were acting in their independent interests. Omnicare thus cannot satisfy the first requirement of its Sherman Act claim, the existence of a contract, combination, or conspiracy. We therefore affirm the district court's grant of summary judgment in Defendants' favor on this claim.

## B.  State Law Claims

In addition to its federal Sherman Act claim, Omnicare also alleged that Defendants violated an antitrust provision of Kentucky's Consumer Protection Act, Ky. Rev.

Stat. § 367.175, committed (and conspired to commit) common law fraud, and were unjustly enriched by their actions. The district court properly invoked its supplemental jurisdiction over these claims, *see* 28 U.S.C. § 1367, and ultimately granted Defendants' motion for summary judgment on all of them.

Omnicare challenges only the dismissal of its fraud and unjust enrichment claims. Though it asserted in its brief that the district court improperly applied Illinois rather than Kentucky law to these claims, at oral argument Omnicare conceded that it did not "matter at all" which law applied because both lead to substantially similar results. "We routinely permit parties to voluntarily abandon previously briefed issues at oral argument as a means of focusing the issues on appeal." *Anchor Glass Container Corp. v. Buschmeier*, 426 F.3d 872, 877 (7th Cir. 2005). We therefore take Omnicare at its word and accept without further investigation the district court's conclusion that Illinois law applies to the state law claims. *Id.*

### 1. Fraud

Omnicare's fraud claim implicates a far smaller universe of evidence than does its Sherman Act claim. Indeed, it rests on a single document, Craig Stephens's October 31, 2005, e-mail to Tim Bien, and a single sentence within that document, the second one. In that e-mail, Stephens, of United, told Bien, of Omnicare, that "PacifiCare's Part D offering for 2006 is a unique contract with CMS. If and when the deal closes, PacifiCare

will follow their own Part D product strategy throughout the 2006 calendar year." The two-sentence e-mail was sent in response to Bien's even briefer query, "When the deal closes, will PacifiCare be contracted with Omnicare as a result of the acquisition?"

For Omnicare to prove at trial that Stephens's e-mail constituted fraud under Illinois law, it would have to demonstrate that United, acting through Stephens, made a false statement of material fact, with knowledge or belief that the statement was false, and with the intent to induce Omnicare to reasonably rely and act on the statement. It would also have to show that United actually achieved such reliance, and caused injury to Omnicare. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 766 (7th Cir. 2010) (reciting Illinois law and citing *Redarowicz v. Ohlendorf*, 441 N.E.2d 324, 331 (Ill. 1982)). Omnicare contends it could do just that. It asserts that the second sentence of the e-mail was literally false or at least misleading because United and PacifiCare employed a concurrent Part D strategy after April 1, 2006, the date when United officially joined PacifiCare's contract. It also alleges that United knew that the statement was false, that the e-mail was part of a broader scheme to induce Omnicare to sign PacifiCare's "any willing provider" contract and eventually move United's Part D's enrollees to it, and that Omnicare was injured by the noncompetitive rate that it agreed to when it did in fact sign the contract.

The district court concluded that Omnicare was unable to demonstrate a genuine issue of material fact as to

the first element, falsity of the statement, and granted Defendants' motion for summary judgment. *See Celotex Corp.*, 477 U.S. at 322. Omnicare disputes that conclusion. It likewise takes issue with the district court's related conclusion that Omnicare failed to establish that United and PacifiCare coordinated their Part D plans. We review the district court's grant of summary judgment de novo, making all reasonable inferences in Omnicare's favor. *See, e.g.*, *Tri-Gen*, 433 F.3d at 1030.

Omnicare contends that Stephens's representation was literally false, or, in the alternative, that it has raised a material issue of fact as to whether United and PacifiCare pursued separate Part D strategies throughout 2006. Omnicare fails to recognize, however, that Stephens's statement, even if false, was at best "a false statement of intent regarding future conduct rather than present or past facts*." Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 413 (7th Cir. 2009). Such statements are considered "promissory fraud," which as a general rule is "not actionable under Illinois law unless the plaintiff also proves that the act was a part of a scheme to defraud." *Id.* (quoting *Ass'n Benefit Servs., Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007)); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 682 (Ill. 1989). As discussed at length above, Omnicare has not put forth sufficient evidence to prove that PacifiCare and United were engaged in a scheme to defraud it, and consequently it cannot demonstrate that Stephens's e-mail was part of any broader scheme. Thus, even if the district court was wrong in concluding that Stephens's statement was a true response to Bien's

query, it properly prevented Omnicare's fraud claim from moving forward. By virtue of our de novo review, we may affirm summary judgment on any basis supported in the record, *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 681 (7th Cir. 2007), and we do so here.

### 2. Unjust Enrichment

Omnicare also contends that United and PacifiCare have been unjustly enriched as a result of their illegal conspiracy against it. The district court granted summary judgment to Defendants on this claim, reasoning that Omnicare could not demonstrate an illegal conspiracy and thus could not possibly demonstrate that Defendants were thereby enriched. The district court also noted, in the alternative, that plaintiffs proceeding under Illinois law cannot raise unjust enrichment claims when "there is a specific contract that governs the relationship of the parties." *Omnicare*, 594 F. Supp. 2d at 980 (quoting *Stathis v. Geldermann, Inc.*, 692 N.E.2d 798, 812 (Ill. App. Ct. 1998)).

Omnicare challenges the district court's second rationale. It asserts that a case decided after the *Stathis* case cited by the district court clarified that unjust enrichment claims are sustainable even where a contract exists if the plaintiff alleges that it was fraudulently induced into entering the contract. Appellant's Br. 54. Omnicare does not challenge, however, the district court's "fundamental[ ]" reason, *Omnicare*, 594 F. Supp. 2d. at 981, for granting Defendants' summary judgment motion on its unjust enrichment claim.

Omnicare's unjust enrichment claim unambiguously (and fatally) rests upon the existence of a scheme among Defendants. "[W]hen the plaintiff's particular theory of unjust enrichment is based on alleged fraudulent dealings and we reject the plaintiff's claims that those dealings, indeed, *were* fraudulent, the theory of unjust enrichment that the plaintiff has pursued is no longer viable." *Ass'n Ben. Servs., Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007). As Omnicare cannot prove the existence of a conspiracy, it follows that it cannot demonstrate that Defendants were enriched thereby. We therefore affirm the district court's grant of summary judgment on Omnicare's unjust enrichment claim.

### C. Motion for Partial Summary Judgment

Omnicare filed a motion for partial summary judgment (alternatively denominated as a motion to strike) as to five of Defendants' affirmative defenses that it contended could not succeed as a matter of law. The district court denied the motion without explanation in the concluding paragraph of its opinion and order. *See Omnicare*, 594 F. Supp. 2d at 981. We review a district court's denial of a motion for partial summary judgment the same way we review its grant of a motion for summary judgment: de novo, with all inferences construed in favor of the nonmoving party. *Belcher v. Norton*, 497 F.3d 742, 747 (7th Cir. 2007). There is no need to undertake such a review here, however, in light of our resolution of Defendants' motion for summary judgment

in their favor. Omnicare's allegations have been resolved and it is no longer necessary for Defendants to affirmatively defend themselves against them. Omnicare's motion challenging these defenses is consequently rendered moot and its dismissal warrants no further consideration.

### III. Conclusion

The evidence in the record before us does not create a genuine issue of material fact as to the existence of an anticompetitive agreement among Defendants. Omnicare therefore cannot prove that Defendants violated section 1 of the Sherman Act, and the district court properly granted summary judgment in Defendants' favor on that claim. The lack of an agreement between PacifiCare and United necessarily undermines Omnicare's remaining state law claims, which were also properly dismissed at the summary judgment stage. In light of the dismissal of Omnicare's claims, Omnicare's motion for partial summary judgment on the issue of Defendants' affirmative defenses cannot proceed either. We thus AFFIRM the judgment of the district court.